In re MAXWELL COMMUNICATION
CORPORATION plc, et al.,
Debtors.

MAXWELL COMMUNICATION CORPO-
RATION plc, by Andrew Mark HOMAN,
Colin Graham Bird, Jonathan Guy An-
thony Phillips, and Alan Rae Jamieson,
its Joint Administrators, Plaintiffs,

and

Richard A. Gitlin, Examiner,
Intervenor Plaintiff,

v.

BARCLAYS BANK plc, Defendant.

MAXWELL COMMUNICATION CORPO-
RATION plc, by Andrew Mark HOMAN,
Colin Graham Bird, Jonathan Guy An-
thony Phillips, and Alan Rae Dalziel
Jamieson, its Joint Administrators, and
Richard A. Gitlin, Examiner, Plaintiffs,

v.

NATIONAL WESTMINSTER
BANK plc, Defendant.

MAXWELL COMMUNICATION CORPO-
RATION plc, by Andrew Mark HOMAN,
Colin Graham Bird, Jonathan Anthony
Guy Phillips, and Alan Rae Dalziel Ja-
mieson, its Joint Administrators, Plain-
tiffs,

v.

SOCIÉTÉ GÉNÈRALE, Defendant.

Bankruptcy No. 91B 15741.
Adv. Nos. 92–1181A, 93–9622A
and 94–8066A.

United States Bankruptcy Court,
S.D. New York.

Aug. 5, 1994.

As Corrected Aug. 10, 1994.

Milbank, Tweed, Hadley & McCloy by John Gellene, John Jerome and Lisa Turiel, New York City, for the Joint Administrators.

Simpson Thacher & Bartlett by Thomas Rice and Steven Fuhrman, New York City, for Barclays Bank plc.

Davis Polk & Wardwell by Henry King, Karen Wagner and James Rouhandeh, Sullivan & Cromwell by John Dickey, New York City, for National Westminster Bank plc.

White & Case by Jeffrey Barist, Helena Tavares and Jennifer Sheppard, New York City, for Société Générale.

Hebb & Gitlin by Evan Flaschen and Ronald Siverman, Hartford, CT, for Richard Gitlin, Examiner.

Jay Lawrence Westbrook, Austin, TX, amicus curiae.

## OPINION ON MOTIONS TO DISMISS

TINA L. BROZMAN, Bankruptcy Judge.

When filed, the insolvency case of Maxwell Communications Corporation plc (MCC) was unique, MCC, an English corporation, having filed a chapter 11 petition in this court followed immediately by a petition for administration in the High Court of Justice in London. What was so unusual about this is that both cases were and remained, through each court's approval of a joint plan of reorganization and scheme of arrangement, primary proceedings under the laws of the respective nations. Not a lot of imagination is needed to predict that under such circumstances choice-of-law questions might arise. And, indeed, in a very limited sense they have.

MCC, prior to its bankruptcy, made some large transfers in England to three banks, two English [1] and one French [2], which MCC, through the joint administrators appointed by the High Court, now seeks to recover as preferential under U.S. law. The banks, which do not challenge my subject matter jurisdiction over the chapter 11 case or my personal jurisdiction over them, nonetheless urge me to dismiss the preference actions under a variety of theories all of which are grounded in the notion that these transfers ought be governed by U.K. law and adjudicated in the parallel English proceedings. If successful in their quest for dismissal the banks may be very successful, for it is likely that under the English analogue to our preference law, the transfers would not be avoidable. The English administrators, openly desirous of substantially augmenting MCC's estate, contend that I must apply U.S. law. There is a certain irony in this; so well have the two cases been meshed that the administrators urge that I not defer to the court which appointed them.

### I.

The salient facts are uncontroverted.[3] MCC is an English holding company which was controlled by Ian Robert Maxwell from 1981 until his untimely death in November, 1991.[4] MCC's crown jewels were its 100%

---

1. The two English banks are Barclays Bank plc (Barclays) and National Westminster Bank plc (NatWest).

2. The French bank is Société Générale (SocGen).

3. Because the parties agree on the facts for purposes of these motions, most of which facts are drawn from the complaints, it is unnecessary to determine which documents extraneous to the

pleadings may be utilized. All parties have agreed to my consideration of the affidavits submitted and the exhibits annexed to them.

4. Maxwell's empire comprised two components, the "private side" companies owned by the Maxwell family and believed to be headed by Headington Investments, Ltd., and the "public side" companies headed by MCC, which is owned publicly and in minority part by Headington. *In re*

ownership, directly or indirectly, of two American entities, the well-known publishing company Macmillan, Inc. (Macmillan) and Official Airlines Guide, Inc. (OAG), which together constituted approximately 80% of MCC's total asset pool. MCC had acquired Macmillan in 1988 for roughly $2.6 billion and OAG that same year for approximately $750 million. Although the most valuable of MCC's subsidiaries were found in the United States, most of MCC's debt was incurred in England.

## A. Background

On December 16, 1991, shortly after Maxwell died and his financial empire began crumbling, MCC filed its chapter 11 petition. MCC having substantial asset holdings in this country, no one disputed my jurisdiction to entertain its petition. The following day, both to protect against dismemberment by English creditors of its assets held outside the United States and because directors of an insolvent English corporation may be liable for trading while insolvent, MCC presented a petition to the High Court of Justice for an administration order under the Insolvency Act 1986. On December 20, 1991, Mr. Justice Leonard Hoffmann appointed Andrew Mark Homan, Colin Graham Bird and Jonathan Guy Anthony Phillips as joint administrators in the English proceeding. Rice Aff. Exh. D.[5] On that same day, I appointed Richard Gitlin, Esq., as examiner in the U.S. proceeding. *Id.* Exh. E. The examiner's mandate was to harmonize the two proceedings so as to permit a reorganization under U.S. law which would maximize the return to creditors.

The joint administrators in England and the examiner in New York, subject to the jurisdiction of both courts, have carried out the administration of MCC in unprecedented cooperation with each other. To aid that endeavor, Mr. Justice Hoffmann and I entered orders authorizing the joint administrators and the examiner to coordinate their efforts. They have done so in accordance with a document called the "Protocol." Rice Aff. Exh. F. My January 15, 1992, order

approving that Protocol recognized the joint administrators as the corporate governance of MCC. *Id.* In similar fashion, Mr. Justice Hoffmann granted standing to the examiner to be heard in his court. The order expressed not to affect the jurisdiction of the High Court in England or of this court under our respective laws or to preclude any party from seeking an expansion or reduction of the examiner's powers. *Id.* Nor did it place any limits on the exercise of avoidance powers under the Bankruptcy Code or the Insolvency Act 1986.

In February, 1993, building on what the Protocol had created, the joint administrators, with the concurrence of the examiner, filed their plan of reorganization (plan) and scheme of arrangement (scheme). Although separate plan and scheme documents exist, the plan and scheme are mutually dependent and, in their effect, constitute a single mechanism, consistent with the laws of both countries, for reorganizing MCC through the sale of assets as going concerns and for distributing assets to creditors. The disclosure statement accompanying MCC's plan provided creditors around the world with a summary of the plan and an explanation of the potential for recoveries to creditors from asset dispositions and causes of action, including preferences under U.S. law. Rather than carving up the assets for distribution by the two courts to different groups of creditors, the plan and scheme set up a single "pot" for distribution to all creditors. In keeping with the single distribution mechanism, creditors were permitted to submit a claim in either jurisdiction which would suffice for participation under both the plan and scheme.

This was all explained to creditors in MCC's disclosure statement, which provided in pertinent part that

A creditor who has a right to claim in the [U.S.] Chapter 11 case, or who would have a right to claim if MCC were liquidated under U.K. law ... can claim under the Plan and Scheme by a single filing in either jurisdiction. The Plan and Scheme permit the forum for resolution of disputed

---

*Brierley,* 145 B.R. 151, 154 (Bankr.S.D.N.Y. 1992).

5. Later, a fourth administrator, Alan Rae Jamieson, was added.

claims against MCC to be determined on a case by case basis. While in many cases the choice of forum for determining a disputed claim should not affect the application of substantive legal principles to a disputed claim for purposes of the Plan and the Scheme, creditors are urged to seek their own advice regarding the differences, if any, between alternative forums affecting the allowance of any particular disputed claim.

The Plan and Scheme provide for a "bar order" equivalent to that normally obtained in US proceedings but also provide for the allowance of late Notices of Claim to the extent that the Administrators or the English Court determine that the creditor's failure to file a Notice of Claim on or before the Claims Date did not result from wilful default or lack of reasonable diligence.

The Plan and the Scheme provide for the retention of the Assets by MCC, subject to any valid and existing Encumbrances, for purposes of sale or other disposition and ultimately for Distributions to creditors under the Plan and the Scheme ... MCC shall retain the right to object to Claims ... and to exercise all powers, claims or causes of action under the US Bankruptcy Code and the UK Insolvency Act. Under the Plan and the Scheme, the net proceeds of the realization of MCC's assets will ... be applied first in payment of Preferential Liabilities (including Allowed US Priority Claims) in full and then in payment of distributions in respect of Allowed Class 3A Claims and other Scheme Liabilities.

See Rice Aff. Exh. M at pp. 133–36. The plan and scheme established September 27, 1993, as the last day to file claims in the U.S. and to lodge claims in the U.K. All three defendants lodged claims with the U.K. court; none filed a proof of claim with this court.

Voting on MCC's plan was completed on July 1, 1993, with holders of 99.3% in number and 99.98% in amount of class 3A (general unsecured) claims voting to accept the plan. I confirmed MCC's plan on July 14, 1993. The U.K. court sanctioned MCC's scheme pursuant to section 425 of the Companies Act 1985 the following week, with holders of 99.3% in number and 99.7% in amount of scheme claims voting to accept the scheme.

### B. Barclays' Involvement With MCC [6]

Barclays, as a member of MCC's creditors' committee [7], has taken an active role in MCC's case. Although most of Barclays' branch offices are located in the United Kingdom, Barclays maintains branches in several major American cities, including New York.

Until November, 1991, MCC had an agreement with Barclays for an overdraft facility at Barclays' Holborn, London, branch. Barclays had originally made the overdraft facility available in 1985 to British Printing & Communications Corporation plc, which changed its name to MCC in 1981 after Maxwell had taken control of the company. See Supplemental Rice Aff. Exh. A; Bradford Aff. ¶ 6. The limit on that facility was expressed in British pounds sterling and initially capped at £5 million. (That cap increased over time.) The agreement provided that MCC's drawings could be made in any convertible currency and that MCC's foreign currency drawings had to be repaid to "such bank or branch of the bank as the bank shall specify." The loan facility was expressed to be governed by English law. See Rice Aff. Exh. Q at 2.

By October, 1991, MCC had drawn $30 million against Barclays' facility and Barclays began expressing concern about both the amount of MCC's drawings and MCC's ability to pay down the overdraft. Rice Exh. R. at 2. On October 18, 1991, Richard F. Pelly, then a corporate finance director with Barclays in London, wrote Kevin Maxwell (one of Maxwell's sons and himself an MCC di-

---

6. The factual predicate for Barclays' motion has already been laid out in large measure in the judgments of the High Court of Justice, Chancery Division, dated July 28, 1992, and of the Supreme Court of Judicature, Court of Appeal, dated October 8, 1992. See Rice Aff. Exhs. Q & R.

7. There is an official committee in the U.K. case. There is only an unofficial committee in the U.S. case. Membership of the two is nearly identical.

rector), stating that Pelly did not wish the existing facility to be extended beyond its October 23, 1991, maturity. *See* Pelly Aff. Exh. B.

On November 1, 1991, Macmillan sold its computer publishing subsidiary known as QUE to Prentice–Hall, Inc. (Prentice–Hall), for $157.5 million. At MCC's direction, Prentice–Hall paid the purchase price to NatWest in New York, where the funds were later credited to a teller suspense account [8] and almost immediately thereafter credited to MCC's U.S. dollar account with NatWest in London. For reasons which will become apparent, Macmillan's sale of QUE was an important transaction vis-a-vis Barclays.

On November 15, 1991, Pelly again wrote Kevin Maxwell concerning the repayment of the overdraft, confirming the agreement Pelly and Kevin had reached that MCC would repay the full $30 million upon the maturity of the facility. One week later, Pelly and Kevin spoke by phone while Kevin was in *The Daily News'* New York offices [9]. Their conversation concerned Pelly, who sensed Kevin's reluctance to repay the full $30 million. Pelly wrote Kevin again:

> I am writing to follow up my letter of 15th November and our telephone conversation on [T]hursday night when you were in your office at The Daily News.
>
> I was most concerned by your apparent reluctance to stick to our agreement that the $30 million drawing under the above facility would be repaid on maturity on 25th November from the proceeds of the sale of QUE. I understand that somewhere in the region of $160 million of these proceeds are deposited with the NatWest and that the company is capable of abiding by its contractual arrangements with [Barclays]. However, you intimated that you were taking advice from NatWest not to make the payment to Barclays.
>
> This letter will serve as a warning that the non-payment of the $30 million will result in a breach of the facility and Barclays will

take whatever action is required to recover its money.

. . . .

> We believe the cooperation of [Barclays] will be important to you over the days and weeks to come, both on the Private Side and in discussions regarding the financing of MCC to which we will continue to provide significant facilities after the repayment of the $30 million. However, we will not be inclined to "Standstill", thereby improving the position of other banks, if the $30 million remains outstanding.

*See* Pelly Aff. Exh. D.

On November 26, 1991, Pelly met with Kevin Maxwell in London and again threatened action if the $30 million were not repaid. Rice Aff. Exh. R at 4. MCC repaid the $30 million that same day from its Nat-West dollar account (which held the QUE proceeds) to Barclays' branch in New York, through which all payments to Barclays made in dollars are routed. It was then credited to the overdraft account at Barclays' Holborn branch in London.

### C. *Barclays' Unsuccessful Quest For Injunctive Relief*

Barclays apparently understood long before the promulgation of the plan and scheme that the repayment which it had received and the pressure which it brought to bear to obtain that repayment exposed it to the possibility of a preference suit under U.S. law. Seizing the offense, Barclays sought in England to enjoin the joint administrators from commencing in this court any preference suit under U.S. law arising from MCC's $30 million repayment. Upon *ex parte* application presented in July, 1992, it obtained from the High Court (from a justice other than Mr. Justice Hoffmann) an interim injunction restraining the joint administrators and MCC from commencing any preference action here against Barclays. Rice Aff. Exh. P. The asserted rationale, stated in simple terms, was that U.S. law would likely invalidate the transfer whereas U.K. law would not and

---

8. A teller suspense account is an account maintained for the temporary deposit of funds prior to transfer. *See* Bradford Aff. ¶ 13 n. 4.

9. Maxwell Newspapers, Inc., a private-side Maxwell company, owned *The Daily News* at the time.

that application of U.S. law would contravene U.K. policy in a fundamental manner.

When Barclays requested continuation of the interim injunction pending trial, Mr. Justice Hoffmann declined to fetter the case in this court and vacated the prior injunction. In so doing, Mr. Justice Hoffmann underscored the cooperation between the two courts:

> [T]he normal assumption is that the foreign judge is the best person to decide whether an action in his own court should proceed.
>
> .    .    .    .    .
>
> It is therefore sufficient for me to say that, having regard to the connecting factor provided by the source of the repayment money [MCC's sale of QUE, an American asset], a decision by the U.S. court to assert jurisdiction under [Bankruptcy Code] § 547 would not in my judgment involve, according to English notions, so egregious a claim of extra-territoriality that justice requires that it should be prevented by injunction.
>
> .    .    .    .    .
>
> I think that the suggestion [by Barclays] of forum shopping misunderstands the position of the administrators. They are not simply litigants free to choose where to shop. They are officers of this court but also the corporate governance of MCC as debtor in possession for the purposes of Chapter 11 ... In their American capacity, they owe fiduciary duties under U.S. law. These may include a duty to creditors generally to bring proceedings under § 547.
>
> .    .    .    .    .
>
> The fiduciary position of the administrators in U.S. law means ... that although they are personally subject to the English jurisdiction and MCC is an English company, this court has in the end no real control over what is done in the name of MCC in New York. It seems to me, therefore, that an injunction (were I otherwise disposed to grant it) could serve no purpose except to antagonize the U.S. court and prejudice the cooperation which has thus far prevailed between the chapter 11 and the English administration. If the U.S. judge

does not think that there is a sufficient connection with America to justify a preference action against Barclays, she will dismiss [MCC's] suit.

Rice Aff. Exh. Q at 12–16.

On October 8, 1992, the Supreme Court of Judicature, Court of Appeal, dismissed Barclay's appeal of Mr. Justice Hoffmann's judgment. In ruling, Lord Justice Glidewell noted that the jurisdiction to enjoin ought be exercised rarely and with proper recognition of comity:

> It has sometimes been said that the granting of an injunction preventing a plaintiff from pursuing an action in a foreign court is a restriction on him personally, and not an interference with the exercise by the foreign court of its own jurisdiction. It will not be surprising, however, if the judge in the foreign court sometimes fails to appreciate the distinction.
>
> .    .    .    .    .
>
> It is of course for that reason that the jurisdiction is to be exercised rarely, and with proper recognition of comity, i.e. of the respect owed to the foreign court.
>
> .    .    .    .    .
>
> [W]here the foreign proceedings are not vexatious or oppressive, it is *prima facie* for the foreign court to decide whether or not it is the appropriate forum for the decision of the suit before it.
>
> .    .    .    .    .
>
> [T]he disadvantages to Barclays [of defending a suit in the U.S. court based on U.S. preference law must] be balanced against the advantage to the Administrators/the Examiner, acting on behalf of the creditors of Maxwell Communications. While it is true that American law differs from English law in this respect, of itself there is nothing inherently oppressive about the difference.

Rice Aff. Exh. R at 12–13, 17 and 19. Barclays' request for leave to appeal to the House of Lords was denied.

The injunction having been lifted, MCC started an adversary proceeding against Barclays seeking the return as preferential of

the $30 million payment to Barclays (the Money Market Payment). MCC later amended its complaint to add a second preference claim for eleven additional transfers made to Barclays, which, when deducted from transfers Barclays made to or on behalf of MCC, total approximately £2.1 million (the Net Overdraft Payments). Barclays moved to dismiss the complaint.

Barclays has maintained consistently that the preference action ought be adjudicated in England in accordance with English law. In furtherance of that position, Barclays objected to confirmation of the plan to dispel any argument that the joint administrators might later raise that confirmation foreclosed Barclays' motion to dismiss the preference action. The joint administrators' counsel, in response to Barclays' objection, noted at that hearing that

> the provisions of the Plan . . . in relation to the retention of jurisdiction of this Court, in part on an exclusive basis and in part on a coextensive basis with the English court, is not intended to prejudice the merits of the arguments presented by Barclays in their adversary proceeding, and in particular in a motion to dismiss the adversary proceeding which has been filed with this Court. The provisions of [the Plan] are in the nature of a retention of jurisdiction which we believe this Court already has. It is I think a commonplace that neither the Plan nor the Scheme could confer jurisdiction on this Court that the Court did not have, and in the nature of a retention of jurisdiction as the Court has, it is not intended and we believe do[es] not operate either to confer jurisdiction or to prejudice or affect the outcome of any substantive issue.

*See* Rice Reply Aff. Exh. A at 21.

D. *NatWest's Involvement with MCC*

Like Barclays, NatWest is headquartered in London. NatWest's dealings with MCC (and its predecessors in name) extend back as far as the 1930s; its dealings with Robert Maxwell date back to the early 1950s. Bradford Aff. ¶ 8. MCC maintained a number of sterling and foreign currency accounts with NatWest, most of which were located in England. Overdraft rights on these accounts provided MCC with working capital which enabled MCC to meet, in part, its cash flow needs. These overdraft facilities were located in England. MCC also maintained an account in the New York branch of one of NatWest's subsidiaries, National Westminster Bank USA (Natwest USA). MCC opened this account on November 15, 1991; the account was intended to serve, although it did not so serve, as a repository for the proceeds of the sale of QUE.

On October 4, 1991, almost one month before the QUE sale, Macmillan had sold another of its subsidiaries, Macmillan Directories (Directories), to Reed Publishing (USA), Inc. for approximately $145 million. Macmillan never received any cash from this transaction. Instead, MCC used those proceeds to purchase approximately £83 million. At the direction of MCC, £15 million was then paid to an MCC account at one of NatWest's London branches in satisfaction of an overdraft balance which existed in that NatWest account at the time of the transfer (the Directories transfer).

As I noted above, when Macmillan later sold QUE to Prentice–Hall, the proceeds were deposited into the NatWest teller suspense account in New York. That same day, $154.4 million from that account was transferred to MCC's dollar account at a NatWest branch in London. The majority of the QUE proceeds were subsequently transferred to other banking institutions, Barclays among them. But the amount that remained was converted from dollars to pounds sterling and used to cover the outstanding net overdraft balance of £27.5 million in MCC's NatWest accounts. So as to distinguish this transfer from the QUE proceeds transfer to Barclays, I shall refer to this transfer as the "Natwest QUE transfer." Thus, as with the Money Market Payment to Barclays, the source of the Directories and NatWest QUE transfers was the sale of U.S. assets.

In addition to those two transfers, MCC alleges, during the 90 days before its chapter 11 filing, MCC caused an additional eight transfers to be made directly to NatWest from both Midland Bank and from Robert Maxwell's private-side companies. During

that same period, NatWest made six payments to or on behalf of MCC. The amount of those eight transfers, less payments to or on behalf of MCC, total £29.046 million.

### E. *SocGen's Involvement With MCC*

SocGen is headquartered in Paris and has many branches, including ones in London and New York.[10] It has done business with MCC (and its predecessor) since the early 1980s, when SocGen provided MCC's predecessor with interim bridge financing for capital equipment purchases. That facility was replaced in 1984 with a new facility which provided MCC's predecessor with a £2 million working capital facility for U.K. operations. In 1989, SocGen renewed the facility (now with MCC) to provide MCC with up to $10 million, presumably for the same stated purpose.

SocGen claims that whenever MCC drew down on SocGen's working capital facility, which was negotiated and administered in England, SocGen would transfer those funds into MCC's accounts in the London branches of either NatWest or Marine Midland Bank.

On September 30, 1991, MCC, by way of its NatWest account in London, transferred approximately $57,222 to SocGen in payment of interest on a $10 million loan drawn down under SocGen's facility. The following week, through its Marine Midland account in London, MCC transferred to SocGen £5.765 million in payment of the outstanding principal plus interest on the loan. *See* Complaint Against SocGen at ¶¶ 11–13. MCC did not allege in its complaint, as it did with Barclays and Natwest, that SocGen was paid from the proceeds of sale of any U.S. asset owned by MCC. However, MCC suggested at oral argument that, if pressed, it would produce evidence of a U.S. connection of some sort.[11]

### II.

The defendants have each moved to dismiss the preference actions on the theory that U.S. preference law does not apply ex-

traterritorially. They suggest that the transfers giving rise to the respective complaints have little or no significant nexus with the U.S. so as to warrant their adjudication under our law. Only the sources of the transferred funds (the sale of U.S. assets), they say, could be said to link these transfers to U.S. preference law (and with SocGen, there is not even alleged to be that link), and that connection is too tenuous to support the application of U.S. preference law. Alternatively, the defendants argue, if U.S. law does apply, based upon a host of doctrines such as *forum non conveniens,* comity and abstention I should refuse to adjudicate these suits.

After the parties had fully briefed these motions to dismiss, and recognizing that I was yet again treading uncharted territory in the world of transnational insolvencies, I invited Professor Jay Lawrence Westbrook of the University of Texas School of Law to submit an *amicus curiae* brief on the issue of whether U.S. or U.K. preference law ought be applied here. Professor Westbrook has written extensively on several areas of bankruptcy law and not too long ago published an article entitled *Choice of Avoidance Law in Global Insolvencies.* 17 Brook.J.Int'l Law 499 (1991) [hereinafter Westbrook, *Choice of Avoidance Law* ]. Professor Westbrook graciously agreed to aid the court and filed his *amicus* brief on July 15, 1994, in which he concluded that because English avoidance law should govern resolution of these suits, they ought be dismissed. The parties thereafter were given two weeks to respond to Professor Westbrook's brief.

### III.

#### A.

■ A brief word is necessary on the pertinent differences between U.S. and U.K. preference law. Under U.S. bankruptcy law, two purposes animate the statutory avoidance power found in 11 U.S.C. § 547(b). First, the avoidance power promotes the prime bankruptcy policy of equality of distri-

---

10. It is unclear whether SocGen New York is a subsidiary of SocGen, in the same way NatWest USA is a subsidiary of NatWest. *See* Brandon Decl. ¶ 9.

11. The connection was revealed in a memorandum of law to be an inference that proceeds from a U.S. sale were used to make the transfer.

bution among creditors by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate. *In re Barefoot,* 952 F.2d 795, 797–98 (4th Cir.1991); *accord In re Cybermech, Inc.,* 13 F.3d 818, 822 (4th Cir.1994). Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its difficulties in an atmosphere conducive to cooperation. *Id.; In re Ralar Distributors,* 4 F.3d 62, 65 (1st Cir.1993). The purpose for the transfer is not dispositive of the question whether that transfer qualifies as an avoidable preference under the Code, because it is the effect of the transaction, rather than the debtor's or creditor's intent or state of mind in making the transfer, that is controlling. *In re Interior Wood Products Co.,* 986 F.2d 228, 231 (8th Cir.1993); *In re Perma Pacific Properties,* 983 F.2d 964, 968 (10th Cir.1992); *In re T.B. Westex Foods, Inc.,* 950 F.2d 1187, 1195 (5th Cir.1992); 4 L. King, *Collier on Bankruptcy* ¶ 547.01 at 547–12–13 (15th ed. 1993).[12]

The corresponding provision empowering an English court to set aside a preference on the insolvency of a company is found in section 239 of the Insolvency Act 1986. Under subsection (4) of that statute, a company gives a preference to a creditor if it does anything which has the effect of putting that creditor into a better position, in the event of the company's liquidation, than he would have been in if the thing had not been done. This sounds a lot like section 547 of the Bankruptcy Code. The law diverges from our own in subsection (5), which provides that a person shall not be ordered to repay a preference unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b), that is, to put him in a better position on insolvency. Insolvency Act 1986 § 239(4)(b), (5). The subjective intention of the debtor company in making the payment is critical. *Re M.C. Bacon Ltd.* [1990] BCC 76; Rice. Aff. Exh. R at 6. And it is this element which the defendants say renders their transfers unassailable under U.K. law, unlike under U.S. law.

## B.

The defendants suggest that their motions turn on the presumption against extraterritoriality, as it was applied by the Supreme Court in *E.E.O.C. v. Arabian American Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). The argument which they advance is that section 547 is conclusively presumed to be domestic in its application, as a result of which, since their transfers were in payment of debt incurred outside the U.S. and were made overseas by a foreign debtor [13], the complaints must be dismissed.[14]

---

**12.** If, however, the transfer qualifies as a *prima facie* preference but the transfer is made in payment of a debt incurred in the ordinary course of the business of the debtor and the transferee, the transfer is made in the ordinary course of business of the debtor and the transferee and the transfer is made according to ordinary business terms, the trustee may not avoid it. 11 U.S.C. § 547(c)(2). Comparing this to the English law, discussed below, one sees that the statutes are not so dissimilar. Under the English law, the debtor must intend to prefer or the transfer is not avoidable. Under the American law, subjective intent is irrelevant, but if the debtor does not act in an ordinary manner, the transfer is avoidable.

**13.** Much as I would relish the opportunity to address whether a debtor which is a U.S. entity could use section 547 to recover a preference made to a foreign creditor, I think it is best to refrain from such *dicta.*

**14.** Barclays and NatWest suggest that where the presumption against extraterritoriality is not overcome, dismissal ought be granted for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). However, Justice Scalia, dissenting in part in *Hartford Fire Insurance Co. v. California,* —— U.S. ——, ——, 113 S.Ct. 2891, 2918, 125 L.Ed.2d 612 (1993), noted that where the extraterritoriality presumption is not overcome, the court does not dismiss for want of subject matter jurisdiction. Instead, the court decides the claim, ruling on the merits that the plaintiff has failed to state a cause of action under the relevant statute. *Accord Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909); *Amlon Metals, Inc. v. FMC Corp.,* 775 F.Supp. 668, 670–72 (S.D.N.Y.1991). I agree with Justice Scalia that dismissal for failure to overcome the presumption against extraterritoriality is tantamount to dismissal under Fed.R.Civ.P. 12(b)(6), for what is at issue is not my subject matter jurisdiction over these preference suits (which I plainly have), but instead

One must first determine, of course, whether the application which the plaintiff attempts is extraterritorial at all and only then, if it is, does one proceed to the question whether the extraterritorial application is permissible. *See Kollias v. D & G Marine Maintenance,* 29 F.3d 67, 70–71 (2d Cir.1994).

■■■ Not every transaction that has a foreign element represents an extraterritorial application of our laws. The court must look at the facts of a case to determine whether they have a center of gravity outside the United States. Thus, for example, a transfer made in the U.S. by a foreign national to a foreign national conceivably could be considered a domestic transaction. So, too, a transfer made overseas to a U.S. creditor of a U.S. debtor conceivably could be considered a domestic transaction. *See In re Pacat Finance,* 295 F. 394, 401, 411 (S.D.N.Y.1923). Once it is determined that the facts as a whole have a center of gravity outside the U.S., then the court's attention should shift to the propriety of the proposed extraterritorial application of U.S. law. Here, no one suggests that, under our facts, the use of section 547 would be anything other than extraterritorial. After all, the debtor is an English corporation, the antecedents debts were incurred overseas, the transfers on account of those debts were made overseas and the recipients, although subject to my personal jurisdiction, are nonetheless all foreigners. That the monies transferred were derived from the sale of assets in the U.S. (as to two of the defendants) is not enough to convert the use of section 547 in this instance to a domestic application.

The presumption against extraterritoriality was expressed almost a century ago in *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) where the Court refused to extend the Sherman Antitrust Act extraterritorially to a dispute between an American banana exporter

operating in Panama and another banana exporter arising out of the latter's seizure of the former's Panamanian plantation. Justice Oliver Wendell Holmes noted that "the general and almost universal rule is that the character of an act as lawful or unlawful must be determined wholly by the law of the country where the act is done." 213 U.S. at 356, 29 S.Ct. at 512. This rule, he concluded, "would lead in case of doubt to a construction of any statute as intended to be confined in its operation and effect to the territorial limits over which the lawmaker has general and legitimate power." *Id.* at 357, 29 S.Ct. at 513.

The defendants concede that Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. *Aramco,* 499 U.S. at 247–48, 111 S.Ct. at 1230 (1991) (citing *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 284–85, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). Whether it has in fact exercised that authority is a matter of statutory construction. *Id.*

In *Aramco,* the Court reaffirmed the "long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" 499 U.S. at 247, 111 S.Ct. at 1230 (quoting *Foley,* 336 U.S. at 285, 69 S.Ct. at 578); *accord Labor Union of Pico, Korea v. Pico Products,* 968 F.2d 191, 194 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992); *Subafilms, Ltd. v. MGM–Pathe Communications Co.,* 24 F.3d 1088, 1094–95 (9th Cir.1994). This canon of statutory construction, among other functions, serves to protect against unintended clashes between our laws and those of other nations which could result in international discord. *Aramco,* 499 U.S. at 247–48, 111 S.Ct. at 1230 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963)).[15] It is this concern over

---

whether I may extend section 547 of the Code across the seas, or in other words, whether the joint administrators have stated a claim under the relevant provision of the Bankruptcy Code.

**15.** The canon derives as well from the deference of courts to Congress, the courts recognizing that

Congress alone maintains the facilities necessary to fairly make such important policy decisions as whether to extend our laws beyond our borders. *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957).

unintended international clashes that has prompted Professor Westbrook and the commentators to view extraterritoriality as a sub-genre of choice of law. *See* Weintraub, *Choosing Law With An Eye On The Prize,* 15 Mich.J.Int'l L. 705, 709 (1994); Waller, *A Unified Theory of Transnational Procedure,* 26 Cornell Int'l.L.J. 101, 116 nn. 76, 117 (1993); Westbrook, *Extraterritoriality, Conflicts of Laws and the Regulation of Transnational Business,* 25 Tex.Int'l.L.J. 71, 74–75 (1990) [hereinafter Westbrook, *Extraterritoriality* ]. This is not to say that if there is little fear of international discord, the presumption may be safely discarded. To the contrary, "the presumption ... applies even if the potential for international discord is weak or nonexistent." *Kollias v. D & G Marine Maintenance,* 29 F.3d at 71.

Until its decision in *Aramco,* the Court had analyzed extraterritoriality in light of three prudential considerations. These considerations included: (1) whether the language of the statute in question provided any Congressional indication that the legislature intended to apply that statute extraterritorially; (2) whether the legislative history evinced Congressional intent to apply the statute extraterritorially; and (3) whether the pertinent administrative interpretations of the statute, if they exist, evinced Congressional intent to extend the statute's reach. *Foley,* 336 U.S. at 285, 288–90, 69 S.Ct. at 577–78, 579–80. In *Aramco,* the Supreme Court concluded that unless an affirmative intent of Congress to the contrary has been clearly expressed in the statute itself, courts must presume that Congress is primarily concerned with domestic conditions. *Aramco,* 499 U.S. at 247–48, 111 S.Ct. at 1230; *accord Subafilms,* 24 F.3d at 1094–95; *Van Blaricom v. Burlington Northern R.R. Co.,* 17 F.3d 1224 (9th Cir.1994); *Pico,* 968 F.2d at 194; *Hammell v. Paribas,* 1993 WL 426844, *1 (S.D.N.Y. Oct. 22, 1993); *see also* J. Turley, *Dualistic Values in the Age of International Legisprudence,* 44 Hastings L.Rev. 185, 221–22 (1993). The *Aramco* dissent and commentators have read *Aramco* to transform *Foley*'s three factors to a "clear statement" rule which focused solely on the first of the *Foley* factors, the statute's language. *See Kollias,* 29 F.3d at 71. Interestingly,

*Aramco* did not overrule *Foley,* nor did the Court explicitly attempt to distance *Aramco* from *Foley.* In fact, *Aramco*'s analytical framework is based in large measure on *Foley.* 499 U.S. at 247–48, 111 S.Ct. at 1230.

Not three weeks ago, the Second Circuit Court of Appeals again addressed extraterritoriality. *See Kollias,* 29 F.3d 67. *Kollias* involved the question whether the Longshore and Harbor Workers' Compensation Act applied extraterritoriality. The *Kollias* panel attempted to square *Aramco*'s seeming "clear statement rule" with the body of case law which preceded and has since followed *Aramco.* The panel noted that

[t]he *Aramco* dissent and some commentators have interpreted the majority opinion in *Aramco* as setting forth a "clear statement" rule, such that the presumption against extraterritoriality cannot be overcome absent a clear statement in the statute itself ... If the presumption against extraterritoriality were a clear statement rule, reference to the legislative history and other extrinsic indicia of congressional intent, including administrative interpretations, would be prohibited. In *Aramco* itself, however, the Court considered the EEOC's interpretation of Title VII. *Aramco,* 499 U.S. at 258 [111 S.Ct. at 1235–36]. Moreover, the Supreme Court has made clear since *Aramco* that reference to nontextual sources is permissible. For example, in *Sale v. Haitian Centers Council, Inc.,* the Supreme Court analyzed whether section 243(h) of the Immigration and Nationality Act of 1952 applied extraterritorially by looking to "all available evidence about the meaning of section 243(h)." [— U.S. ——, ——] 113 S.Ct. 2549, 2562 [125 L.Ed.2d 128] (1993). Indeed, in considering the impact of an amendment to the statute, the Court noted that "not a scintilla of evidence of such an intent [for extraterritorial application] can be found in the legislative history" and concluded that section 243(h) did not apply extraterritorially.

29 F.3d at 73. Given this most recent pronouncement, it appears that, at least in this Circuit, the court's focus extends beyond the language of the statute itself to its legislative

reports and any other indicia of Congressional intent.

■ The joint administrators, arms locked with the examiner's, urge me to hold that U.S. preference law is extraterritorial in effect because the Bankruptcy Code is extraterritorial in effect. They say I must look to the fabric of the Code as a whole, rather than to the wording of section 547 read in isolation. The defendants contend that I may look only to the wording of section 547. The proper analysis would appear to be somewhere in the middle of the positions taken by the parties. That is, the court may look to the act as a whole to determine whether there is some Congressional intent evidenced to apply the particular section in question extraterritorially. *See U.S. v. Javino*, 960 F.2d 1137, 1142 (2d Cir.1992) (whether section 5822 of Title 26 of the U.S.Code applied extraterritorially); *accord Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2151, 119 L.Ed.2d 351 (1992) (Stevens, J., concurring); *Amlon Metals, Inc. v. FMC Corp.*, 775 F.Supp. 668, 674–75 (S.D.N.Y. 1991). Other decisions, without addressing whether one looks to a specific section alone or to the act as a whole when determining whether extraterritoriality is permissible, have confined their analysis to a particular section. *See, e.g., Haitian Centers Council*, —— U.S. ——, 113 S.Ct. 2549 (whether section 243(h) of the Immigration and Naturalization Act of 1952 applied extraterritorially); *Foley*, 336 U.S. 281, 69 S.Ct. 575 (whether the Eight Hour Law, a labor statute, applied extraterritorially); *Pico*, 968 F.2d 191 (whether section 301 of the Labor Management Relations Act applied extraterritorially).

■ There is nothing in either the language or legislative history of section 547 which demonstrates a clearly expressed congressional intent that this particular Code provision apply extraterritorially. The fact that the term "transfer," as used in section 547 has been interpreted quite broadly does not change this conclusion. The definition of transfer found in section 101(54) of the Code is undeniably broad but makes no reference whatsoever to the place where the transfer occurred or the place where the property is now found. As *Aramco* made clear, broad, boilerplate language in a statute, without more, is not enough to confer extraterritorial effect on that statute. 499 U.S. at 251–52, 111 S.Ct. at 1232 (quoting *New York Central R. Co. v. Chisholm*, 268 U.S. 29, 31, 45 S.Ct. 402, 402, 69 L.Ed. 828 (1925)); *see also McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19, 83 S.Ct. 671, 676, 9 L.Ed.2d 547 (1963) (statute's broad language, which referred by its terms to foreign commerce, not enough for Court to find presumption overcome, because no "specific language" evincing Congressional intent found). Since section 547 itself contains no indication that it is meant to apply extraterritorially, we look to other provisions of the Code to see whether they evince an intent that section 547 so apply.

Section 541 of the Code, to which the joint administrators initially directed my attention, defines the scope of property of the estate, providing that the estate comprises enumerated types of property wherever located and by whomever held. However, as the Second Circuit Court of Appeals has counseled, property which has been preferentially transferred does not become property of the estate until recovered. *In re Colonial Realty Co.*, 980 F.2d 125, 131–32 (2d Cir.1992); *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1102 (2d Cir.1990).[16] Thus, the fact that the estate is defined to include property overseas does not mean that property which never

---

16. The joint administrators point to the decision in *Hill v. Spencer Savings & Loan Association (In re Bevill, Bresler & Schulman, Inc.)*, 83 B.R. 880, 893–96 (D.N.J.1988) as authority for finding section 547 extraterritorial. *Bevill* was not a chapter 11 case but one brought under the Securities Investor Protection Act (SIPA). The particular avoidance statute there at issue, 15 U.S.C. § 78*lll* (3), explicitly deemed transferred property to be property of the debtor, notwithstanding the transfer. Since the transferred property was property of the estate and since our bankruptcy laws permit recovery of estate property wherever located, there was a rationale for the extraterritorial application of the statute. Moreover, as the court there noted, extraterritorial application of SIPA is consistent with the extraterritorial application of other federal securities laws. Not only is *Bevill* distinguishable from our case, but it precedes *Aramco*, which calls for a clear congressional expression of extraterritoriality.

became property of the estate is subject to recapture through the extraterritorial use of section 547. And for that same reason, the extraterritorial application of section 362, which serves to protect the property of the estate wherever located, see *In re McLean Industries, Inc.,* 74 B.R. 589, 600 (Bankr. S.D.N.Y.1987), does not help the joint administrators either.

The primary thrust of the joint administrators' argument is that Congress unequivocally permitted foreign entities to be debtors under our laws and that it cannot have intended to deny those debtors the arsenal of weapons provided under the Code to augment their estates and foster the policies which underlie section 547. The joint administrators argue that the foreign debtors can use our avoidance laws extraterritorially (so long as there is personal jurisdiction over the defendant) unless the court abstains under 28 U.S.C. § 1334(c)(1). But in the next breath they assert that the court should not abstain in core matters, which matters include avoidance actions. So although they suggest that the use of avoidance laws extraterritorially can be tempered through abstention, they also urge that abstention would never be proper. The examiner, too, argues that the avoidance laws have extraterritorial application but that the court may decline to apply them by dismissing or suspending the entire bankruptcy case under section 305 of the Code. Once having decided to exercise jurisdiction over the foreign debtor's case, the argument continues, the court must apply U.S. avoidance law unless abstention under 28 U.S.C. § 1334 is appropriate. I cannot quarrel with the proposition that Congress permitted foreign debtors or their representatives to avail themselves of our bankruptcy laws. Sections 109(a) and 303(b)(4) of the Code make that crystal clear. I do not agree, however, that in permitting foreign debtors to avail themselves of our law Congress unquestionably must have meant to imbue those debtors with the right to apply our avoidance laws extraterritorially. To embrace the reasoning of the joint administrators and the examiner would be to ignore *Aramco,* which requires an unambiguous expression of congressional intent, gleaned from the language of the statute or other guides to its interpretation. Here, there is no such unmistakable evidence of congressional intent.

The joint administrators urge that the failure to allow foreign debtors resort to extraterritorial application of our avoidance laws relegates such debtors to second-class status. But this is not really so, for where the intended application by the foreign debtor of the avoidance law is not extraterritorial, that is, where the center of gravity of the transaction is in the U.S., the foreign debtor should be able to use our laws.[17] This result is not peculiar. The Code does not permit any foreign debtor to file a bankruptcy case. Rather, the debtor must reside, have a domicile, place of business or property in the United States. 11 U.S.C. § 109(a). Eligibility for U.S. bankruptcy relief can be seen then to be tied to a connection with the United States. Keeping this in mind, it is not strange that an action to recapture for the estate property belonging to a third party must also be tied to the U.S. in some manner other than simply the existence of a bankruptcy case in this country. Moreover, the joint administrators seem to assume that a U.S. debtor can utilize U.S. avoidance laws against any defendant, be it a U.S. or foreign national, anywhere in the world, an issue which I do not decide today, but there is currently no decisional law to breathe life into their assumption.

There are instances where the presumption against extraterritoriality will not apply.

17. Professor Westbrook suggests that there should be a strong presumption against a foreign debtor's use of our avoidance laws if its "home country," that is, the debtor's nerve center, is not located in the United States. He says that the appropriate choice of law in that instance is presumptively the law of the home country, regardless of where the transfer occurred and to whom it was made. Whereas his rationale can be utilized to some extent in ancillary bankruptcy cases under section 304, *see Universal Casualty & Surety Co., Ltd. v. Gee (In re Gee),* 53 B.R. 891, 896 (Bankr.S.D.N.Y.1985), as I will address later in the decision, I have difficulty embracing his approach across the board. Nonetheless, I thank him for the very thoughtful *amicus* brief which helped me to hone in on the relevant considerations in a manner not presented by the parties' initial submissions.

*See Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 531 (D.C.Cir.1993). The first of these is where, as I have already discussed, there is an "affirmative" intention of the Congress clearly expressed to extend the scope of the statute to conduct occurring within other sovereign nations. *Aramco,* 499 U.S. at 247–48, 111 S.Ct. at 1230 (quoting *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957)). *Massey* states in dicta that the second instance where the presumption generally does not bar extraterritoriality is where the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the U.S. 986 F.2d at 531. *Massey* gives as examples the Sherman Anti–Trust Act and the Lanham Trade–Mark Act. In support it cites *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (Lanham Trade–Mark Act); *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) (Sherman Anti–Trust Act); *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 925 (D.C.Cir.1984) (Sherman Anti–Trust Act) and *Schoenbaum v. Firstbrook,* 405 F.2d 200 (2d Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

In *Steele,* however, the conduct was carried out by a U.S. citizen in Mexico who intended to evade U.S. trademark law. Those facts are manifestly distinguishable from ours and involve an intention to escape the reach of U.S. law. In *Aluminum Co.,* the court held that agreements are violative of U.S. anti-trust law "if they were intended to affect imports and did affect them." 148 F.2d at 443. The Second Circuit distinguished from this situation agreements made beyond our borders not intended to affect imports, which nonetheless do affect imports or exports. In this instance, the court stated "when one considers the international complications likely to arise from an effort in this country to treat such agreements as unlawful, it is safe to assume that Congress certainly did not intend the [Sherman Anti–Trust] Act to cover them." *Id.*

*Laker Airways* stands for the same proposition as *Aluminum Co.,* the court finding

jurisdiction under U.S. antitrust laws whenever "conduct is intended to, and results in, substantial effects within the United States." 731 F.2d at 925. Here, it cannot seriously be contended that the alleged preferences were intended to result in substantial effects within the U.S. since there was no insolvency proceeding pending at the time they were made and since preferences are permissible except when an insolvency case is subsequently commenced.[18] Further, the only effect within the U.S. is in relation to the subsequent chapter 11 case, whose filing in the U.S., as I discuss later, was not likely foreseeable. Moreover, the substantiality of that effect is debatable, given that most of MCC's creditors were English. This case is much closer to the example given by the Second Circuit in *Aluminum Co.* of when the antitrust laws would not apply because there was no intent to cause an effect within the U.S.

In *Schoenbaum,* the Second Circuit held that the district court has jurisdiction over violations of the Securities Exchange Act, although the violations take place outside the U.S. when the violations involve stock registered and listed on a national securities exchange in the U.S. and are detrimental to the interests of American investors. There, too, there is an intentional detrimental effect in the U.S., unlike here. More importantly, in each of these cases cited by *Massey,* the ultimate touchstone of extraterritoriality consisted of an ascertainment of congressional intent rather than simply consideration of the consequences of a failure to give a statutory scheme extraterritorial application. *See Subafilms,* 24 F.3d at 1096–97 and n. 13.

The third of the *Massey* examples of instances where the presumption generally does not bar extraterritoriality is where the conduct which Congress seeks to regulate occurs largely within the U.S. Here, the conduct alleged in the complaint did not occur largely within the U.S. The only contact with the U.S. is that the source of the transferred funds (with respect to two of the defendants) was proceeds from the sale of U.S. subsidiaries. The challenged prefer-

---

**18.** *See* footnote 19, *infra.*

ences themselves occurred overseas in payment of the debt incurred overseas between nationals of countries other than the U.S. If the sale of the subsidiaries had constituted the challenged conduct, then it could be said that the conduct occurred within the U.S. But it is not the sale of the subsidiaries which is challenged; it is the subsequent transfer of the proceeds from the sale of the subsidiaries which is at issue. The conclusion to be drawn from all of this is that *Massey* furnishes no cogent reason to depart from the presumption against extraterritoriality.

Finally, the joint administrators suggest that the defendants' arguments are misfocused, and that if a court has a concern for international discord or clashes among nations, the court maintains the ability to refuse to hear the action through resort to the doctrine of *forum non conveniens*. There is a certain appeal to this argument. But as the Supreme Court has declared, were possible or even plausible interpretations of statutory language enough to override the presumption against extraterritorial application, there would be little left of the presumption. *Aramco,* 499 U.S. at 252–54, 111 S.Ct. at 1233. The language from which extraterritoriality is gleaned must be unambiguous, as it was in *Kollias,* 29 F.3d 67, where the act declared that it provided compensation for injuries sustained on the high seas, which the Supreme Court has defined as meaning waters beyond the territorial waters of the United States.

**19.** Justice Scalia's disagreement with the Court centers on whether comity is considered under the first canon or only under the second. He suggests that if the presumption against extraterritoriality does not apply or has been overcome, then the second canon kicks in, with the court determining whether, notwithstanding Congress' intent, extraterritorial application should be denied because it would violate the law of nations. *Id.* at ——, 113 S.Ct. at 2919. The Court, in distinction, did not reject Justice Scalia's analysis but held that there was no conflict between U.S. and U.K. law under the facts of the case because it was possible to comply with both without running afoul of either. Therefore, the Court did not reach the considerations which "might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity." —— U.S. at ——, 113 S.Ct. at 2911.

To be clear, I do not hold today that no debtor may pursue a transfer overseas. What I do hold is that where a foreign debtor makes a preferential transfer to a foreign transferee and the center of gravity of that transfer is overseas, the presumption against extraterritoriality prevents utilization of section 547 to avoid the transfer.

### C.

■ If the presumption against extraterritoriality has been overcome, the court must consider a second canon of statutory construction, wholly independent of the first, which provides that an act of Congress ought never to be construed so as to violate the law of nations if any possible alternative construction exists. *Hartford Fire,* —— U.S. at ——, 113 S.Ct. at 2919 (Scalia, dissenting).[19] Whereas I believe the joint administrators have failed to overcome the presumption against extraterritoriality as to the intended application of section 547, because the issue is a novel one, I will explore the second canon. The second canon "is relevant to determining the reach of a statute because the 'law of nations,' or customary international law, includes limitations on a nation's exercise of its jurisdiction to prescribe." *Id.* (citing Restatement (Third) of Foreign Relations Law of the United States §§ 401–416 (1987) (hereinafter Restatement of Foreign Relations)). Congress, in prescribing laws, is presumed not to exceed customary international law limits on its jurisdiction. Restatement of Foreign Relations at § 402.

Here, the statutes in question do not really purport to regulate or prescribe conduct. Thus one cannot speak in terms of "complying" with both laws. Preferences are not proscribed under either country's law; indeed, there is nothing inherently evil about preferences and a debtor is entitled to prefer creditors prior to bankruptcy, although, with the advent of bankruptcy, the preferences may be susceptible of avoidance. 4 L. King, *Collier on Bankruptcy* ¶ 547.01 at 547–6 (15th ed. 1994) (citing cases pertaining to U.S. law); V. Countryman, *The Concept of a Voidable Preference in Bankruptcy,* 38 Vand.L.Rev. 713, 718 (1985) (as to U.K. law). The issue under the statutes is whether preferences are recoverable and, there, the laws diverge. Thus, the majority opinion in *Hartford Fire* is not implicated.

It is not unfathomable that, in certain circumstances, two or more nations may legitimately seek to exercise jurisdiction over conduct which falls within the reach of their prescribed jurisdictional powers. That could "result in overlap or conflict, actual or potential, and may call for evaluation of the competing interests by a standard of reasonableness as set forth in section 403(3)." *See* Commentary (b) to the Restatement of Foreign Relations § 402. As Justice Scalia states the proposition, a nation having some basis under section 402 for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction "with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable." *Hartford Fire*, —— U.S. at ——, 113 S.Ct. at 2921 (citing Restatement of Foreign Relations § 403(1)); *accord U.S. v. Vasquez–Velasco*, 15 F.3d 833, 840 (9th Cir.1994). That "reasonableness" inquiry turns on a number of factors, including, but not limited to:

(a) the extent to which the activity takes place within the territory or has substantial, direct and foreseeable effect upon or in the territory;

(b) the connections between the regulating nation and the person principally responsible for the activity to be regulated, or between that nation and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of the regulation to the regulating nation, the extent to which other nations regulate such activities, and the degree to which the desireability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international, political, legal or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another nation may have an interest in regulating the activity; and

(h) the likelihood of conflict with another nation.

*See* Restatement of Foreign Relations § 403; *accord Sequihua v. Texaco, Inc.*, 847 F.Supp. 61, 63 (S.D.Tex.1994). When an exercise of jurisdiction by each of two states is not unreasonable, but their regulations conflict, each state is required to evaluate both its interest in exercising jurisdiction and the interests of the other state. If one state has a clearly greater interest, the other should defer. *See* Commentary (e) to the Restatement of Foreign Relations § 403.

Consistent with the presumption that Congress has not exceeded those customary international law limits on jurisdiction to prescribe, the Supreme Court, in a maritime case where the presumption against extraterritoriality was inapplicable, nonetheless stated that in the absence of contrary congressional direction, it would apply principles of choice of law consonant not only with the needs of U.S. law but with due recognition of respect for the relevant interests of foreign nations. *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382–83, 79 S.Ct. 468, 485–86, 3 L.Ed.2d 368 (1959). In more recent cases arising out of federal law other than maritime law, the Supreme Court has recognized the principle that the scope of generally-worded statutes must be construed in light of international law. *See, e.g., Sale*, —— U.S. at —— n. 35, 113 S.Ct. at 2562 n. 35; *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 1516, 71 L.Ed.2d 715 (1982).

Justice Scalia explained in *Hartford Fire* that the lower courts have tempered the extraterritorial application of statutes which have extraterritorial effect with considerations of "international comity," which he described as the respect sovereign nations afford each other by limiting the reach of their laws.[20] —— U.S. at ——, 113 S.Ct. at

---

**20.** A century ago, the Supreme Court said of this type of comity:

"'Comity' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other.

But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other

2920 (citing cases). This comity, he further explained, is a traditional component of choice of law theory. *Id.* The international law limits to which Justice Scalia referred were found in the Restatement (Third) of Foreign Relations Law.

■ We begin our analysis with choice of law considerations. The traditional federal choice-of-law rule [21] is to apply the law of the jurisdiction having the greatest interest in the controversy. *Koreag, Controle et Revision, S.A. v. Refco F/X Associates, Inc. (In re Koreag, Controle et Revision, S.A.),* 961 F.2d 341, 350 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *Wells Fargo Asia Ltd. v. Citibank, N.A.,* 936 F.2d 723, 726 (2d Cir.1991). Under this traditional test, the court is required to evaluate all of the various contacts each jurisdiction has with the controversy in terms of their relative importance with respect to a particular issue and make a reasoned determination as to which jurisdiction's laws and policies are implicated to the greatest extent. *Koreag,* 961 F.2d at 350; *Burgio v. McDonnell Douglas, Inc.,* 747 F.Supp. 865, 870 (E.D.N.Y. 1990).

Choice of avoidance law in multinational bankruptcies may be somewhat thorny, for unlike typical two-party litigation even in the international context, avoidance actions, while commenced by one party (usually the trustee), if successful benefit the unsecured creditors who could be located in any number of jurisdictions. Compounding the difficulty, there is a dearth of case precedent in the area of choice of avoidance law in multinational insolvencies. Westbrook, *Choice of Law* at 519.

Long ago, the Supreme Court disavowed the territorial approach to international insolvencies by which the U.S. would refuse to recognize foreign proceedings. In *Canadian S. Ry. v. Gebhard,* 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020 (1883), the Court upheld the application to New York bondholders of a scheme of arrangement imposed on the cred-

itors of a bankrupt Canadian railroad by the Canadian Parliament. Adopting a home country choice of law rule for a foreign bankrupt with a case pending in a foreign court, the Court commented that "every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes ... He is conclusively presumed to have contracted with a view to such laws of that government ..." *Id.* at 537–38.

At the opposite end of the spectrum from territorialism, which uses local assets to satisfy local claimants in local proceedings with little regard for proceedings or parties elsewhere, is universalism, which would provide a single forum applying a single legal regime to all aspects of a debtor's affairs on a worldwide basis. As the enactment of section 304 of the Bankruptcy Code demonstrates, the United States in ancillary bankruptcy cases has embraced an approach to international insolvency which is a modified form of universalism accepting the central premise of universalism, that is, that assets should be collected and distributed on a worldwide basis, but reserving to local courts discretion to evaluate the fairness of home country procedures and to protect the interests of local creditors. *See, e.g., Koreag,* 961 F.2d 341; *Cunard S.S. Co. v. Salen Reefer Services,* 773 F.2d 452 (2d Cir.1985); *In re Brierley,* 145 B.R. 151; *Gee,* 53 B.R. 891; *In re Culmer,* 25 B.R. 621 (Bankr.S.D.N.Y.1982). From the approach of section 304, which applies in ancillary cases but which also informs this court's decision whether to dismiss or suspend under section 305 a full-scale bankruptcy case in favor of a pending foreign bankruptcy case, see 11 U.S.C. § 305(a)(2), Professor Westbrook extrapolates that U.S. insolvency law should also apply a home country rule in all avoidance actions. As Professor Westbrook has explained his theory, the U.S. approach "rests on the proposition that

---

persons who are under the protection of its law." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

**21.** Federal principles guide my consideration of which jurisdiction's substantive law applies in

cases arising out of federal law, especially when a case involves controversies implicating important federal bankruptcy policies. *Koreag,* 961 F.2d at 350.

in a system of international cooperation any loss to local interests in one case will be roughly balanced by a gain in another case, while commerce in general will be greatly benefited by applying rules predictable in advance by lenders, suppliers and others. In the avoidance area, that predictability can only be obtained by applying the law of the debtor's home country; no other rule can approach it for predictive value." Amicus Brief at 16 (citing Westbrook, *Theory and Pragmatism in Global Insolvencies: Choice of Law and Choice of Forum,* 65 Am.Bankr. L.J. 457, 464–66 (1991)). Although Professor Westbrook calls his recommended approach to choice-of-law questions in the avoidance arena a "home country" one, it is not starkly different from the traditional significant contacts approach of the Restatement, for as Professor Westbrook admitted in his brief to this court, it may still be necessary to search for the jurisdiction which can be designated most appropriately the home country. And in an age of multinational corporations, it may be that two (or more) countries have equal claim to be the "home country" of the debtor. Certainly, one could not simply employ the nation of incorporation alone as the determinant for identification of the home country. Rather, to arrive at a reasoned selection for choice-of-law purposes, one must look at this factor and more, factors such as where the debtor's "nerve center," assets, and creditors are located and where the debtor's business is primarily conducted. Other factors would include the reasonable expectations of parties, as the Supreme Court adverted to in *Gebhard.*

The most fundamental problem with Professor Westbrook's approach is that it would establish a special choice-of-law rule applicable only to avoidance actions. His concept could not be imported into the broader arena, for if it were, it would dictate that the U.S. bankruptcy courts refrain from administering cases in which the debtor's home country is not the U.S.—and that would be at war with the whole scheme of our insolvency law. Notwithstanding the lack of predictability under the traditional choice of law approach

which unpredictability Professor Westbrook deplores [22], it seems preferable that the same analysis be utilized in all federal choice-of-law questions. (Interestingly, Mr. Justice Hoffmann apparently anticipated that the traditional analysis would be employed by this court for he stated that "[i]f the U.S. judge does not think there is a sufficient connection with America to justify a preference action against Barclays, she will dismiss the company's suit." Rice Aff. Exh. Q.)

Adoption of the home country test might well be desirable if there were a widespread treaty or convention which regulated international insolvencies. Unfortunately, there is none. And even under section 304, the U.S. has not adopted this approach; the section permits relief with respect to any "foreign proceeding," which is defined to encompass a proceeding pending in any "foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding...." 11 U.S.C. § 101(23). Moreover, section 304 does not mandate blind adherence to the foreign court's decrees, but requires the U.S. court to consider the factors set forth in section 304(c).

In any event, whether one applies the Restatement's traditional choice-of-law analysis or Professor Westbrook's more radical approach, the conclusion is inescapable that, as Professor Westbrook concluded, English law ought govern resolution of these suits. MCC was a publicly-owned holding company, incorporated in England and run, for all intents and purposes, by MCC executives out of Maxwell House in London subject to the direction of an English board of directors.[23] MCC negotiated its loans with these defendants in England and provided that English law would govern resolution of any disputes arising therefrom. The challenged transfers occurred in England and the recipients, two of which were English banks, were located in England. It is certainly questionable whether the defendants reasonably could have expected U.S. law to apply. At the time that MCC's chapter 11 case was filed, no other company had filed primary proceedings in

---

**22.** As implied earlier in the text, the home country rule would also lack predictability in many cases where the debtor had significant contacts with more than one jurisdiction.

**23.** I was cognizant of its "Englishness" when in the Protocol I recognized the joint administrators, appointed by an English court, as the corporate governance of MCC.

both the U.S. and another country. Because, as mentioned earlier, English directors can be personally liable for trading while insolvent [24], it is a reasonable assumption that an insolvent or nearly insolvent English enterprise will file proceedings in England as in fact, MCC did. It would have taken a crystal ball to foresee a dual filing.

Much as Professor Westbrook noted, the financial structure of the MCC chain of companies was not such that by virtue of MCC's demise, U.S. jobs and community interests were put at immediate risk. As it transpired, MCC's subsidiaries (both in the U.S. and abroad) were sold as going concerns. Moreover, when the chapter 11 case was filed, the overwhelming majority of MCC's creditors were English. (Some claims have been traded to sophisticated U.S. creditors, but those postpetition trades are not relevant for choice-of-law purposes).

This forum's policy interests in retaining jurisdiction over these suits are not very compelling when viewed in their totality because the ultimate purpose of our preference laws, recoupment and equal distribution, exists under the Insolvency Act 1986 as well. England's avoidance law in general, and its preference law in particular, is not repugnant to ours, albeit that it is somewhat different. In fact, our own preference law derives from English law. Countryman, *The Concept of A Voidable Preference in Bankruptcy* at 713. In any event, our bankruptcy policy is less compelling here than it might be in other cases because most of MCC's creditors do not reside in the United States. It is true that MCC's most valuable assets, OAG and Macmillan, were located in the United States; however, even U.S. creditors of MCC had to know when they incurred their debt that they were dealing with an English company, headquartered in London, whose management and ownership were in England. Because there is an insolvency proceeding pending in England, that country's interest in applying its avoidance laws to transfers made in England by an English corporation to recipients found in England, on account of debt incurred in England, is greater than is

this country's interest in applying U.S. law. Were we concerned with transfers made by Macmillan to its creditors rather than with transfers by MCC to its creditors, the equation might well be different, but on these facts, it would seem that the most reasonable outcome would be to apply U.K. law, notwithstanding that the estate may be precluded from recovering the challenged transfers. In short, the factors set forth in the Restatement point decidedly towards the application of U.K. law.

Because I find that English law ought govern, considerations of comity dictate that these suits be dismissed.

CONCLUSION

In light of my conclusion that the presumption against extraterritoriality precludes these suits and that even if the presumption does not bar them England has the greater interest in applying its law, I find it unnecessary to address the defendants' remaining arguments.

The defendants are directed to SETTLE ORDERS consistent with this decision.

---

**24.** Section 214 of the Insolvency Act 1986 may impose liability on a director of a company in insolvent liquidation if, before the commencement of the winding up of the company, the director knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation.