In re MAXWELL COMMUNICATION CORPORATION plc, by Andrew Mark HOMAN, Colin Graham Bird, Jonathan Guy Anthony Phillips and Alan Rae Dalziel Jamieson, its Joint Administrators, Debtor.

MAXWELL COMMUNICATION CORPORATION plc, by Andrew Mark HOMAN, Colin Graham Bird, Jonathan Guy Anthony Phillips and Alan Rae Dalziel Jamieson, its Joint Administrators, Plaintiff–Appellant,

Richard A. Gitlin, Examiner, Intervenor–Plaintiff–Appellant,

v.

SOCIETE GENERALE, Barclays Bank plc, National Westminster Bank plc, Defendants–Appellees.

Nos. 1527 to 1531, Dockets 95–5076, 95–5078, 95–5082, 95–5084 and 95–5086.

United States Court of Appeals, Second Circuit.

Argued May 10, 1996.

Decided Aug. 21, 1996.

Kenneth N. Klee, Cambridge, Massachusetts (John J. Jerome, John G. Gellene, Milbank, Tweed, Hadley & McCloy, New York City, of counsel), for Appellant Maxwell Communication Corp.

G. Eric Brunstad, Jr., Hartford, Connecticut (Evan D. Flaschen, Scott H. Rothstein, Hebb & Gitlin, Hartford, Connecticut, of counsel), for Appellant Richard A. Gitlin.

Allan L. Gropper, New York City (Jennifer L. Sheppard, White & Case, New York City, of counsel), for Appellee Société Générale.

Thomas C. Rice, New York City (Steven Fuhrman, Dennis C. O'Donnell, Ian Yankwitt, Simpson Thacher & Bartlett, New York City, of counsel), for Appellee Barclays Bank.

John Dickey, New York City (James H. Carter, Tamar Feder, Sullivan & Cromwell, New York City; Henry L. King, Karen E. Wagner, Robert R. Strang, Davis Polk & Wardwell, New York City, of counsel), for Appellee National Westminster Bank.

Before: CARDAMONE, ALTIMARI, and PARKER, Circuit Judges.

CARDAMONE, Circuit Judge:

The demise of the late British media magnate Robert Maxwell and that of the corpora-

tion bearing his name, the Maxwell Communication Corporation plc, followed a similar and scandalous path, spawning civil and criminal litigation in England and around the world. This case illustrates that some positive consequences have resulted from these parallel demises. From Maxwell's mysterious death, which forced his international corporation into bankruptcy, was born a unique judicial administration of the debtor corporation by parallel and cooperative proceedings in the courts of the United States and England aimed at harmonizing the laws of both countries and also aimed at maximizing the benefits to creditors and the prospects of rehabilitation.

We have before us a small but significant piece of the swirling legal controversy that followed the collapse of Robert Maxwell's media empire. The question to be addressed is whether Maxwell Communication, as a debtor estate in Chapter 11, may recover under American law millions of dollars it transferred to three foreign banks shortly before declaring bankruptcy. It has sought such relief in adversary proceedings in the bankruptcy court under those sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330 (1994) (Bankruptcy Code or Code), providing for what is known as "avoidance" of pre-petition transactions. Because, in our view, the doctrine of international comity supports deferring to the courts and laws of England, we affirm the dismissal of the Chapter 11 debtor's complaints.

## BACKGROUND

The facts underlying this appeal have been described in the opinions of the bankruptcy court, *see Maxwell Communication Corp. v. Barclays Bank plc (In re Maxwell Communication Corp.)*, 170 B.R. 800, 801–07 (Bankr. S.D.N.Y.1994) (Brozman, B.J.) (*Maxwell I* ), and the district court, *see Maxwell Communication Corp. v. Societe Generale plc (In re Maxwell Communication Corp.)*, 186 B.R. 807, 812–15 (S.D.N.Y.1995) (Scheindlin, J.) (*Maxwell II* ), and we assume the readers' familiarity with them. For purposes of clarity, we highlight those background aspects most helpful to understanding this appeal.

### A. Events Preceding the Dual Filings

The debtor was originally incorporated in England over 60 years ago as a limited company. Robert Maxwell acquired control of this limited company 15 years ago. The following year, the company was re-registered under English law as a public limited company and, in 1987, it became Maxwell Communication Corporation plc (hereafter Maxwell or the debtor). Before filing for bankruptcy protection, Maxwell functioned as a holding company for Robert Maxwell's "public side" holdings—as distinguished from Maxwell's private holdings, which at one time included the *New York Daily News*—and controlled a variety of media-related companies. Although Maxwell was headquartered and managed in England and incurred most of its debt there, approximately 80 percent of its assets were located in the United States, most notably its subsidiaries Macmillan, Inc. and Official Airlines Guide, Inc.

Maxwell alleges that in the fall of 1991, less than 90 days before its Chapter 11 filing, it made several transfers—transfers it now seeks to avoid—to three European banks (collectively, the banks) with whom it had credit arrangements. Two of these banks are Barclays Bank plc (Barclays) and National Westminster Bank plc (National Westminster), both of which have their headquarters in London and maintain an international presence, with branches in New York and elsewhere. The other bank is Société Générale, a French Bank headquartered in Paris with offices, among other places, in London and New York.

From 1985 until 1991 Maxwell obtained credit from Barclays under the terms of a credit arrangement known in England as an "overdraft facility." This written agreement, negotiated in London, stated that any disputes arising under it would be governed by English law. Maxwell drew $30 million under the overdraft facility, none of which had been repaid on November 24, 1991, the agreed-upon maturity date. Two days later, under pressure from Barclays' banking director in London, Maxwell repaid the $30 million from the proceeds of the sale of Que Computer Books, Inc. (Que), a subsidiary of Macmillan in New York. The Que proceeds

had originally been deposited in a Maxwell account at the New York branch of National Westminster and subsequently credited to Maxwell's U.S. dollar account with National Westminster in London. On November 26, 1991 repayment was effected by transferring $30 million from Maxwell's dollar account in London to Barclays' New York branch, which was then credited the following day against the balance in the appropriate Maxwell overdraft account at Barclays in London. In addition to this transfer from the Que proceeds, Maxwell alleged in its amended complaint that 11 other transfers of funds were made to Barclays during the 90 days preceding Maxwell's bankruptcy filing, amounting to a total of £2,110,970 (net of various payments by Barclays to or on behalf of Maxwell during the same period). No connection between these other transfers and the United States was alleged in the complaint.

National Westminster's relationship with the debtor began in the 1930s and continued through the bankruptcy filing. As of late 1991 Maxwell maintained several accounts with National Westminster, with overdraft facilities to help it meet its cash needs. These arrangements were similar to those it had with Barclays in that they were negotiated in England and provided for the governance of English law. In October 1991 Maxwell received $145 million from the sale of Macmillan Directories, Inc. (another Macmillan subsidiary in the United States) and used the proceeds—which had been paid into a Maxwell account at Citibank in New York and thereafter credited to an account at Citibank in London—to purchase British pounds. Maxwell then paid £15 million from these proceeds to an account it maintained at National Westminster's London branch. Maxwell then applied the £15 million to satisfy an overdraft balance with National Westminster.

In November 1991 Maxwell converted a portion of the $157.5 million of Que proceeds (originally deposited in National Westminster's New York branch but then transferred to its London branch) into £27.5 million. It used this sum to cover its overdraft balances in National Westminster's London branch. The purchase of pounds sterling and subsequent credits to the National Westminster overdraft accounts occurred in London. Maxwell also alleges it made eight other transfers to National Westminster from accounts at Midland Bank in London shortly before Maxwell's bankruptcy filing, payments which amounted to £29,046,738 (net of payments by National Westminster to Maxwell during the same period).

Société Générale also extended credit to Maxwell under an agreement negotiated and administered in England. On October 7, 1991, in satisfaction of principal and interest on a $10 million loan extended under that credit arrangement, Maxwell made a payment of roughly £5.765 million to Société Générale. The funds were transferred from an account Maxwell maintained at Marine Midland Bank in London to Société Générale's London branch. Although the debtor did not allege that the transfer was connected to the United States, the district court assumed for purposes of its decision that the funds came from the sale of Macmillan Directories because that sale also occurred on October 7, 1991. *See Maxwell II,* 186 B.R. at 814.

### B. *The Dual Insolvency Proceedings*

On December 16, 1991 Maxwell filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. The next day, it petitioned the High Court of Justice in London for an administration order. Administration, introduced by the Insolvency Act 1986, is the closest equivalent in British law to Chapter 11 relief. Acting under the terms of the Insolvency Act, Justice Hoffman, then of the High Court (now a member of the House of Lords), appointed members of the London office of the accounting firm of Price Waterhouse as administrators to manage the affairs and property of the corporation.

Simultaneous proceedings in different countries, especially in multi-party cases like bankruptcies, can naturally lead to inconsistencies and conflicts. To minimize such problems, Judge Brozman appointed Richard A. Gitlin, Esq. as examiner, pursuant to 11 U.S.C. § 1104(c), in the Chapter 11 proceed-

ings. The order of appointment required the examiner, *inter alia,* to investigate the debtor's financial condition, to function as a mediator among the various parties, and to "act to harmonize, for the benefit of all of [Maxwell's] creditors and stockholders and other parties in interest, [Maxwell's] United States chapter 11 case and [Maxwell's] United Kingdom administration case so as to maximize [the] prospects for rehabilitation and reorganization."

Judge Brozman and Justice Hoffman subsequently authorized the examiner and the administrators to coordinate their efforts pursuant to a so-called Protocol, an agreement between the examiner and the administrators. In approving the Protocol, Judge Brozman recognized the English administrators as the corporate governance of the debtor-in-possession. As the bankruptcy judge later explained, this recognition was motivated not only by the need for coordination but also because Maxwell was "incorporated in England and run ... by [Maxwell] executives out of Maxwell House in London subject to the direction of an English board of directors." *Maxwell I,* 170 B.R. at 817. Justice Hoffman reciprocated, granting the examiner leave to appear before the High Court in England.

These joint efforts resulted in what has been described as a "remarkable sequence of events leading to perhaps the first worldwide plan of orderly liquidation ever achieved." Jay Lawrence Westbrook, *The Lessons of* Maxwell Communication, 64 Fordham L.Rev. 2531, 2535 (1996). The administrators, the examiner, and other interested parties worked together to produce a common system for reorganizing Maxwell by disposing of assets as going concerns and distributing the proceeds to creditors. *Maxwell I,* 170 B.R. at 802. The mechanism for accomplishing this is embodied in a plan of reorganization and a scheme of arrangement, which are interdependent documents and were filed by the administrators in the United States and English courts respectively.

The reorganization plan incorporates the scheme and makes it binding on Maxwell and its creditors. The plan and scheme thus constitute a single and integrated system for realizing the value of Maxwell's assets and paying its creditors. As was set forth in a letter from the administrators to Maxwell's creditors, the proposal was to pay in full all holders of secured claims and of claims enjoying preferential status under United States or English law. The plan and scheme treat all of Maxwell's assets as a single pool and leave them under Maxwell's control for distribution to claimants. They allow any creditor to submit a claim in either jurisdiction. And, in addition to overcoming many of the substantive differences in the insolvency laws of the two jurisdictions, the plan and scheme resolve many procedural differences, such as the time limits for submitting claims.

Following the requisite creditor voting in the United States and England, the plan was approved in the United States and the scheme was approved in England. Judge Brozman entered an order confirming the plan—and, by implication, the scheme incorporated therein—on July 14, 1993. Justice Hoffman thereafter entered an order sanctioning the scheme under § 425 of the Companies Act 1985 on July 21, 1993. Barclays, National Westminster, and Société Générale each filed a notice of claim with the administrators, seeking *pro rata* distributions on various unsecured claims against Maxwell.

Despite the unusual degree of cooperation and reconciliation of the laws of the two forums, the plan and scheme predictably did not resolve all the problems that might arise from the concurrent proceedings. For example, these documents did not specify which substantive law would govern the resolution of disputed claims by creditors. More importantly, they did not address the instant dispute regarding the debtor's ability to set aside pre-petition transfers to certain creditors.

## C. *British Denial of Anti–Suit Injunction*

In July 1992 Barclays faced the possibility that the administrators would institute litigation in the bankruptcy court to recover the $30 million it had received from Maxwell on November 26, 1991. Barclays therefore obtained an *ex parte* order in the High Court (not from Justice Hoffman) barring the commencement of such an action. In seeking to

prevent litigation in the bankruptcy court, Barclays was apparently motivated by a difference in the American and British "avoidance" rules. Rules governing avoidance generally allow the estate to recover certain prepetition transfers of property to creditors occurring within a defined period of time. Such rules are sometimes referred to as the law of preferences because such transfers, left unchecked, may put transferees in a better position than other creditors if the debtor becomes insolvent.

Thus, under 11 U.S.C. § 547(b), a trustee may avoid certain transfers to outside creditors made within 90 days before the filing of the petition. The corresponding provision in English law is § 239 of the Insolvency Act 1986. That section is in many respects similar to the American law, but the British law imposes an additional condition—it limits avoidance to those situations where placing the transferee in a better position was something the debtor intended. *See* Insolvency Act 1986 § 239(5). This seemingly innocuous subjective intent requirement in English law apparently would be a significant or insurmountable obstacle for the administrators were they to litigate the preferences question in London under English law. For obvious reasons, they opposed the anti-suit injunction sought by Barclays, that is, they wanted this issue litigated in the Southern District bankruptcy court.

Following a hearing, Justice Hoffman vacated the *ex parte* order Barclays had obtained. *Re Maxwell Communications Corp. (Barclays Bank plc v. Homan)*, [1992] BCC 757 (Ch.) (*Homan*), aff'd, [1992] BCC 767 (C.A.). The British judge declined to interfere with the American court's determination of the reach of our avoidance law. He cited the British presumption that in such a situation the foreign judge is normally in the best position to decide whether proceedings are to go forward in the foreign court, and the rule that anti-suit injunctions will issue only where an assertion of jurisdiction in the foreign court would be "unconscionable." *Id.* at 761–63.

In so doing, Justice Hoffman noted the cooperative course of the parallel insolvency proceedings. *Id.* at 760. He distinguished recent cases involving the extraterritorial application of American antitrust law, reasoning that injunctive relief is available only if it appears that a foreign court is likely to assert jurisdiction in a manner "contrary to accepted principles of international law." *Id.* at 762. The High Court's decision did not pass judgment on the merits of whether the application of American law would violate such norms. *Id.* at 767. It did assume, however, that the bankruptcy court would dismiss the anticipated suit if it found that there was an insufficient connection with the United States. *Id.* This ruling was affirmed by the Court of Appeal, and leave for further review by the House of Lords was denied.

### D. *The Adversary Complaints and the Bankruptcy and District Court Decisions*

Freed from the constraints of an anti-suit injunction, the administrators commenced adversary proceedings in the bankruptcy court against Barclays, National Westminster, and Société Générale. The complaints sought the recovery of the above-described transfers to the banks on the theory that they were avoidable preferences under 11 U.S.C. § 547(b) and therefore recoverable under 11 U.S.C. § 550(a)(1). In addition, each complaint sought the disallowance under 11 U.S.C. § 502(d) of any claims made by the defendant, unless the defendant first returns to the debtor the transferred funds, with interest. This subject is discussed and resolved in Part IV, *infra*. The examiner joined the administrators in instituting these adversary proceedings against National Westminster and intervened in the proceeding against Barclays; he is not a party in Maxwell's suit against Société Générale.

Defendants filed motions for dismissal under Fed.R.Civ.P. 12(b)(6) (made applicable in adversary bankruptcy proceedings by Bankr.R. 7012(b)) asserting, *inter alia*, that applying § 547 of the Bankruptcy Code to these transactions would violate the "presumption against extraterritoriality" and that dismissal was also warranted on grounds of international comity. The bankruptcy court granted the motions, holding that the transfers were extraterritorial and that the Bank-

ruptcy Code does not apply to these transfers, whose "center of gravity" lies outside the United States and, in the alternative, that international comity precluded the application of the Code in this instance. *Maxwell I,* 170 B.R. at 808–18.

Treating comity as a "canon of statutory construction," the bankruptcy court emphasized choice-of-law principles and asked "which jurisdiction's laws and policies are implicated to the greatest extent." *Id.* at 814, 816. The answer, the court found, was England. *Id.* at 817–18. It also noted Maxwell's insolvency did not jeopardize United States interests because its holdings were sold as going businesses, because most of its creditors were not residents of the United States, and because the two countries' preference laws in any event serve similar ends, and that England had a greater interest in applying its own laws. *Id.* at 818.

The district court affirmed on both the extraterritoriality and comity grounds. On the latter question, it held that the "bankruptcy court did not abuse its discretion in finding that traditional choice of law principles 'point decidedly towards the application of U.K. law.'" *Maxwell II,* 186 B.R. at 822. The district court's analysis of the relative interests was substantially similar to that of the bankruptcy court, but it also underscored the cooperation between the courts of the two countries and found that deference would comport with the previous efforts by both courts to harmonize the dual proceedings. *Id.* at 823. Judge Scheindlin believed this to be "the unique aspect and the most important feature of this case." *Id.* at 813.

Maxwell and the examiner appealed. We consolidated the three cases on January 15, 1996 and now address the merits.

## DISCUSSION

■ A district court's disposition of an appeal from a bankruptcy court is subject to plenary review, *Air Line Pilots Ass'n v. Shugrue (In re Ionosphere Clubs, Inc.),* 22 F.3d 403, 406 (2d Cir.1994), and we therefore analyze the bankruptcy court's decision by the same standards the district court followed. The complaints were dismissed for failure to state a cause of action upon which relief may be granted, and such dismissals are ordinarily subject to *de novo* review. *Valley Disposal v. Central Vt. Solid Waste Mgt. Dist.,* 31 F.3d 89, 93 (2d Cir.1994). In evaluating an order granting dismissal of an action, the non-movants' factual allegations are taken as true and all permissible inferences are drawn in their favor; dismissal is warranted only if it plainly appears that the non-movant "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). With those rules in mind, we examine the propriety of the order of dismissal.

### I  *Res Judicata*

■ The administrators' first contention is that the July 14, 1993 confirmation order precludes the banks from challenging the application of the Bankruptcy Code to the present proceedings. In so arguing, they rely primarily on § 10.01 of the plan, which provides that "[n]otwithstanding confirmation and consummation of the Plan, the U.S. Court shall exclusively retain such jurisdiction as it had prior to confirmation and consummation ... (e) to determine any and all avoidance or similar actions brought, or which may be brought, under the U.S. Bankruptcy Code, by or on behalf of the Company, including actions pursuant to sections 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, and 553." The administrators assert that the plan, which was made binding upon all creditors by the confirmation order, in that way vested sole and exclusive jurisdiction in the bankruptcy court to decide avoidance actions.

■ This argument has a superficial plausibility, but upon analysis it lacks substance. An order of confirmation concededly binds the debtor and its creditors whether or not they have accepted the confirmed plan. Thus, it has preclusive effect. *See* 11 U.S.C. § 1141(a); *Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991) (*res judicata* bars any attempt by parties to reorganization hearing to relitigate matters raised or that could have been raised). But the scope of that preclusive effect is limited by the content of the reorga-

nization plan and the confirmation order. Here the order and plan do not address the specific issue presented, namely, whether the debtor may maintain an avoidance action in the bankruptcy court to recover the pre-petition transfers to the defendant banks.

Section 10.01 of the plan is not helpful to the administrators because it simply assures that confirmation will not reduce the bankruptcy court's jurisdiction over certain matters. The provision does not expand the court's jurisdiction, nor does it purport to give the court exclusive jurisdiction—or any jurisdiction, for that matter—over avoidance actions that are *not* governed by the Bankruptcy Code. Because the banks prevailed in the bankruptcy and district courts on the theory that the Bankruptcy Code's substantive law does not govern these adversary proceedings, the retention of jurisdiction in § 10.01 is not relevant.

■ Moreover, the administrators' argument is inconsistent with the position they adopted at the confirmation hearing. On the day of the hearing, Barclays had already made its Rule 12(b)(6) motion in the adversary proceeding, and apparently had threatened to object to confirmation unless its arguments for dismissal were preserved. To avoid this possible difficulty, administrators' counsel stated on the record that "[w]ith regard to ... the Barclays Bank objection to confirmation ... we are pleased to represent to the Court, that the provisions of the Plan in Article 10 ... [were] not intended to prejudice the merits of the arguments presented by Barclays in their adversary proceeding." Under these circumstances, the administrators are estopped from asserting the contrary. *Cf. Hurd v. DiMento & Sullivan,* 440 F.2d 1322, 1323 (1st Cir.) (per curiam) (litigant estopped from relying on factual allegation directly contrary to representation made to trial court in prior proceeding), *cert. denied,* 404 U.S. 862, 92 S.Ct. 164, 30 L.Ed.2d 105 (1971).

■ The administrators assert further that clause 11 of the scheme of arrangement expressly entitles them to object to claims of creditors in the jurisdiction which they select. That clause, which applies only to notices of claim filed with the administrators—not proofs of claim filed with the bankruptcy court—does allow the administrators to object "for any reason under any applicable law." Contrary to the administrators' assertion, however, the document does not permit the administrators to select the forum for resolving such a dispute; in fact, clause 11.6 provides that the dissatisfied *creditor*—not the administrators—must apply "to the Court" to ascertain liability. The scheme's definition of "the Court," found in Annexure 1—"the English Court or the U.S. Court, as is the more appropriate forum in the particular case"—is not helpful to the administrators, nor does the scheme explain which law is the "applicable" one. The cited portion of the scheme therefore supplies only vague choice-of-forum and choice-of-law rules. Obviously, it does not grant the administrators authority to decide which court is "more appropriate" in the given case, or which law is "applicable." These are matters entrusted to the courts to decide.

■ The administrators' final contention concerning the binding effect of the plan is that the banks' remaining claims against the debtor will be discharged pursuant to § 1141(d) if the claims are not allowed under § 502 of the Code, because this is a Chapter 11 proceeding and the estate property is subject to the bankruptcy court's jurisdiction. The argument appears to be that Maxwell will be absolved automatically from making any distributions to the banks unless the banks' claims are adjudged "allowed" by the bankruptcy court. We reject this contention as well. First, confirmation of a Chapter 11 plan will ordinarily discharge pre-existing debts whether or not they are "allowed," but the Code predictably does not grant debtors such relief where a plan or confirmation order provides otherwise. *See* 11 U.S.C. § 1141(d)(1)(A). In other words, discharge under § 1142 does not hinge on whether a claim is "allowed."

Second, even assuming it is relevant whether a claim is "allowed," we believe the banks' claims will be "allowed" if the provisions of the plan are followed. A review of the plan is instructive in this regard. Under § 6.06 of the plan, the administrators are to

file in the U.S. copies of notices of claim received from claimants in England. This is sufficient to constitute the filing of a proof-of-claim under 11 U.S.C. § 501. *See Liona Corp. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585, 605 (2d Cir.1991) (explaining that purpose of notice of claims rules is to keep all parties informed). Under § 502(a), if a proof of claim is filed, it is "deemed allowed" *unless* there is a timely objection by a party in interest. But here, under the right circumstances, there can be no such objection. Clause 11.6 of the scheme quite clearly states that a creditor filing a notice of claim in England may resort to "the Court" for a determination of liability if the administrators object to the claim. Where "the Court" is the court in England, *i.e.,* where that forum is "the more appropriate" one, clause 11.6 provides that the *English* court will "determine the amount of the [liability]." If the claimant prevails, the scheme further provides in clause 5 that the creditor will receive a distribution from the estate on a *pari passu* basis.

Hence, the plan requires claims such as the banks'—assuming the English court is the "appropriate" one, a question that is left for case-by-case determination—to be paid regardless of whether the bankruptcy court *adjudicates* the claim as "allowed" or "disallowed" under § 502(b). The reorganization plan—which is binding upon the administrators and Maxwell's creditors—states that certain claims will be adjudicated in England under "applicable law," and the administrators are therefore estopped from objecting to such claims in the bankruptcy court. Such objections are utterly inconsistent with the plan negotiated by the parties and the collective action necessary for its successful implementation.

The estate would be free to urge before Judge Brozman that the bankruptcy court is the "appropriate" forum and that American law is "applicable," as the choice of the appropriate forum is a case-specific inquiry. But given the terms of the plan they could not seek disallowance in the bankruptcy court under United States law where the plan contemplates that liability is to be determined elsewhere under different law. *Cf.*

*First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enters.),* 81 F.3d 1310, 1316 (4th Cir. 1996) (party-in-interest's failure to object before confirmation of Chapter 11 plan barred post-confirmation objection; claim was deemed allowed under § 502(a)). This is true despite the fact that the bankruptcy court retains concurrent jurisdiction over claims disputes under § 10.02 of the plan. That court has jurisdiction to decide objections to the allowance of claims, but equity does not permit the administrators to litigate objections in the bankruptcy court when doing so conflicts with a basic assumption of the plan and scheme. Thus, the banks' claims may be "allowed" despite the absence of a hearing and decision under § 502.

Third, the banks' claims—if the English court is the proper forum for determining their validity—are not automatically discharged by § 1141(d) of the Code because, as our foregoing analysis makes clear, the plan provides they must be paid if validated in England. For all these reasons, the confirmation order, binding though it may be, does not preclude the banks from seeking dismissal of Maxwell's complaints.

## II  International Comity

### A.  The Doctrine

■ Analysis of comity often begins with the definition proffered by Justice Gray in *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895): " 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." Although *Hilton* addressed the degree to which a foreign judgment is conclusive in a court of the United States, the principle expressed is one of broad application.

■ Whether a court is applying the common law, as in *Hilton,* or applying a

statute enacted by Congress, as in the present case, "[i]nternational law, ... including ... questions arising under what is usually called private international law, or the conflict of laws, and concerning the rights of persons within the territory and dominion of one nation, by reason of acts, private or public, done within the dominions of another nation—is part of our law." *Hilton*, 159 U.S. at 163, 16 S.Ct. at 143; *see Romero v. International Terminal Operating Co.*, 358 U.S. 354, 382–83, 79 S.Ct. 468, 485–86, 3 L.Ed.2d 368 (1959) (applying choice-of-law principles to claims asserted under the Jones Act). The doctrine does not impose a limitation on the sovereign power to enact laws applicable to conduct occurring abroad. *E.g., Lauritzen v. Larsen*, 345 U.S. 571, 581–82, 73 S.Ct. 921, 927–28, 97 L.Ed. 1254 (1953); *cf. Hilton*, 159 U.S. at 166, 16 S.Ct. at 144. Instead, it guides our interpretation of statutes that might otherwise be read to apply to such conduct. When construing a statute, the doctrine of international comity is best understood as a guide where the issues to be resolved are entangled in international relations.

In *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), Chief Justice Marshall said that a statute "ought never to be construed to violate the law of nations, if any other possible construction remains." And, as Judge Learned Hand observed in *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443 (2d Cir.1945) (*Alcoa*), "we are not to read general words ... without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the 'Conflict of Laws.'" *See also Société Nationale Industrielle Aérospatiale v. District Court*, 482 U.S. 522, 543–44, 107 S.Ct. 2542, 2555–56, 96 L.Ed.2d 461 (1987) (analyzing treaty in light of "concept of international comity").

▪ Moreover, international comity is a separate notion from the "presumption against extraterritoriality," which requires a clear expression from Congress for a statute to reach non-domestic conduct, *see Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 73 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995). Hence, comity was applied to preclude the application of the Jones Act in *Romero*, where the conduct at issue was otherwise clearly subject to that statute because it occurred in waters of the United States. *See Romero*, 358 U.S. at 383, 79 S.Ct. at 486; *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815–16, 113 S.Ct. 2891, 2919–20, 125 L.Ed.2d 612 (1993) (Scalia, J., dissenting) (presumption against extraterritoriality was inapplicable to *Romero* ).

▪ Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise. *See Romero*, 358 U.S. at 382, 79 S.Ct. at 485–86 (principle applies "in the absence of a contrary congressional direction"); *cf. Hartford Fire*, 509 U.S. at 797–99 & nn. 24–25, 113 S.Ct. at 2909–11 & nn. 24–25 (majority opinion) (noting that "international comity" may be viewed as relevant to whether court should decline to exercise jurisdiction or as a tool for ascertaining the scope of jurisdiction in the first place). We realize that "international comity" may describe two distinct doctrines: as a canon of construction, it might shorten the reach of a statute; second, it may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts. Whether these are two distinct doctrines—and we need not decide that question—in the context of this case the concepts are not two inconsistent propositions.

▪ Comity is exercised with reference to "prevalent doctrines of international law." *Lauritzen*, 345 U.S. at 577, 73 S.Ct. at 926. The management of transnational insolvencies is concededly underdeveloped. However, certain norms shared among nations are relevant to the present case and have guided the choice-of-law analysis in such cases as *Lauritzen* and *Romero*. *See also Alcoa*, 148 F.2d at 443 (referring to similar norms). The same principles are set forth in § 403(1) of the *Restatement (Third) of Foreign Relations* (1986), which provides that states normally refrain from prescribing laws that gov-

ern activities connected with another state "when the exercise of such jurisdiction is unreasonable." *See also United States v. Javino,* 960 F.2d 1137, 1142–43 (2d Cir.) (applying § 403 in ascertaining scope of National Firearms Act), *cert. denied,* 506 U.S. 979, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992); *United States v. Vasquez–Velasco,* 15 F.3d 833, 840 (9th Cir.1994) (applying § 403 to determine reach of federal racketeering law).

█ Whether so legislating would be "unreasonable" is determined "by evaluating all relevant factors, including, where appropriate," such factors as the link between the regulating state and the relevant activity, the connection between that state and the person responsible for the activity (or protected by the regulation), the nature of the regulated activity and its importance to the regulating state, the effect of the regulation on justified expectations, the significance of the regulation to the international system, the extent of other states' interests, and the likelihood of conflict with other states' regulations. *Restatement* § 403(2).

█ The factors enumerated in the *Restatement* correspond to familiar choice-of-law principles. *See, e.g., Romero,* 358 U.S. at 383, 79 S.Ct. at 486 (interacting interests of our own and foreign countries are the controlling considerations); *Lauritzen,* 345 U.S. at 582, 73 S.Ct. at 928; *Koreag, Controle et Revision S.A. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 350 (2d Cir.) ("rule is to apply the law of the jurisdiction having the greatest interest in the litigation"), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). The analysis must consider the international system as a whole in addition to the interests of the individual states, because the effective functioning of that system is to the advantage of all the affected jurisdictions. *See Société Nationale,* 482 U.S. at 555 n. 11, 107 S.Ct. at 2562 n. 11 (Blackmun, J., dissenting) ("Choice-of-law decisions ... reflect the needs of the system as a whole as well as the concerns of the forums with an interest in the controversy."). Comity is a doctrine that takes into account the interests of the United States, the interests of the foreign state, and those mutual interests the family of nations

have in just and efficiently functioning rules of international law. *Id.* at 555, 107 S.Ct. at 2561–62.

### B. *Applicability of the Doctrine to the Case at Hand*

Because Congress legislates against a backdrop that includes those international norms that guide comity analysis, absent a contrary legislative direction the doctrine may properly be used to interpret any statute. Comity is especially important in the context of the Bankruptcy Code for two reasons. First, deference to foreign insolvency proceedings will, in many cases, facilitate "equitable, orderly, and systematic" distribution of the debtor's assets. *Cunard S.S. Co. v. Salen Reefer Servs. AB,* 773 F.2d 452, 458 (2d Cir.1985) ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities."); *Victrix Steamship Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings."). Second, Congress explicitly recognized the importance of the principles of international comity in transnational insolvency situations when it revised the bankruptcy laws. *See* 11 U.S.C. § 304; *see* S.Rep. No. 989, 95th Cong., 2d Sess. 35, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5821 (explaining § 304).

█ The examiner contends the doctrine is inapplicable to the present case because Congress has "conclusively resolved" whether the preference law applies "by legislative direction." Although such a direction would obviously make it easier to decide this case, the examiner has not pointed us to a statutory section that supports his contention. Instead, he relies on § 103(a), which simply states that the provisions of Chapter 5 of the Bankruptcy Code, including § 547 and § 502(d), "apply in a case under chapter ... 11." But § 103(a) contains only "general words," which we have held must be read with regard to the traditional limitations states impose on the exercise of their power to prescribe laws. *Alcoa,* 148 F.2d at 443; *see also Lauritzen,* 345 U.S. at 581, 73 S.Ct.

at 927–28 (Congress was on notice that "generality of language" in Jones Act would lead courts to apply it with reference to international maritime law). Such general words do not limit the application of international comity, nor do they "conclusively resolve" this issue. The same is true of other statutory provisions relied upon by the examiner. *See* § 303(b)(4) (permitting "foreign representative of the estate in a foreign proceeding" to file involuntary petition); § 109(a) (limiting "debtor" status).

■ The plaintiffs cite a variety of other Code sections that purportedly direct courts not to apply comity principles. For example, the examiner suggests that because Congress, in § 304 of the Code, established a flexible procedure for conducting a proceeding "ancillary" to a foreign proceeding, it must have intended to prohibit such flexibility in ordinary Chapter 11 proceedings. But, as we have previously noted, the inclusion of § 304 in the Code and the explicit reference in it to "comity" should not be read "to overrule in foreign bankruptcies well-established principles based on considerations of international comity." *Cunard,* 773 F.2d at 456. We are unable to conclude from § 304 that it was Congress' purpose that courts ignore principles of comity when deciding whether to apply the avoidance law. The provision in § 304 has even less significance than the general words interpreted in *Lauritzen* and *Alcoa.* Similarly, the Code provisions referring to "applicable law" or "applicable nonbankruptcy law" cited by the administrators, *see* 11 U.S.C. §§ 363(f)(1), 365(c)(1)(A), 510(a), 541(c)(2), 544(b), 1126(b)(1), afford no statutory basis for ignoring comity considerations.

■ Nor are we persuaded by the examiner's conclusory assertion that the Bankruptcy Code always applies, comity notwithstanding, when a bankruptcy case has been properly commenced, and that choice-of-law analysis is never appropriate in a bankruptcy case. The examiner relies heavily on *Nolte v. Hudson Navigation Co.,* 31 F.2d 527 (2d Cir.1929), an equity receivership case holding that the measure of unsecured bondholders' provable claims was governed by the law of the forum rather than the state in which the

debtor was incorporated. Rejecting the rule proffered by the unsecured creditors, Judge Swan reasoned that the proceeding was not a winding-up proceeding governed by the law of the state of incorporation, but was in the nature of an "equitable execution,"—"a remedy accorded creditors by the law of the forum, in order to reach their debtor's property and apply it in satisfaction of their claims." *Id.* at 529.

Assuming *arguendo* that bankruptcy proceedings are among those remedies *Nolte* referred to—those accorded to creditors by the law of the forum—the rationale in *Nolte* is nonetheless inapposite. There a receiver had been appointed in New York to dispose of property in that state. Here, to maximize the return to creditors, there are two concurrent proceedings involving property in two jurisdictions. Thus, to say that the law of "the forum" governs begs the question, and our refusal in *Nolte* to apply the law of the debtor's state of incorporation can give plaintiffs no comfort. Indeed, the difference between that case and the present one—here, there are two forums—illuminates why resort to choice-of-law principles is necessary. For the same reason, the examiner's citation to *Prudential Ins. Co. of Am. v. Land Estates,* 110 F.2d 617 (2d Cir.1940), another receivership case, which held only that New York law provided for the application of the forum state's law, is unpersuasive. Neither *Nolte* nor *Prudential* points to any statutory basis for ignoring comity principles in analyzing the Bankruptcy Code. We therefore are unable to accept plaintiffs' contention that the terms of the statute preclude us from giving effect to comity.

### C. *True Conflict*

■ We move next to plaintiffs' argument that the use of the doctrine is improper because there is no conflict between the Bankruptcy Code and English law. International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction. *Hartford Fire,* 509 U.S. at 798, 113 S.Ct. at 2910; *Société Nationale,* 482 U.S. at 555, 107 S.Ct. at 2561–62 (Blackmun, J., dissenting) (existence of a true conflict is a "threshold ques-

tion"). Plaintiffs maintain there is no true conflict between American and English avoidance rules because English law does not require conduct that violates American law. They insist, in addition, that the English courts' decision not to enjoin the debtor's estate from bringing the instant avoidance action against Barclays suggests there is no conflict between the two countries' laws. These propositions are unpersuasive. We believe there is a true conflict necessitating the application of comity principles to ascertain the compass of the Code.

In *Hartford Fire*, 509 U.S. at 798–99, 113 S.Ct. at 2910–11, the Supreme Court held that international comity provided no basis for limiting a district court's employment of American antitrust law against boycotting activities undertaken by British reinsurers doing business in the United Kingdom. The Court reasoned that although the reinsurers' conduct—alleged to violate the Sherman Act—was consistent with comprehensive regulations established by the British Parliament, this difference between the two laws did not amount to a conflict. *Id.* Instead, what was required to establish a true conflict was an allegation that compliance with the regulatory laws of both countries would be impossible. *Id.* at 799, 113 S.Ct. at 2910–11.

The conclusion that American and British avoidance law conflict comports with *Hartford Fire*. As we have previously noted, *Hartford Fire* recognized that "other concerns" might be implicated if the context were different. *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir.1994) (citing *Hartford Fire*, 509 U.S. at 799, 113 S.Ct. at 2910–11). In *Sterling Drug* those "other concerns" were present in the context of a dispute over the scope of an extraterritorial injunction under the Lanham Act. The instant dispute over the applicability of the avoidance provision of the Bankruptcy Code is also significantly different from the circumstances confronting the Supreme Court in *Hartford Fire*, a Sherman Act case. This difference compels a different conclusion.

There are several reasons for this. First, avoidance rules do not regulate conduct in the same fashion as do prohibitions against anti-competitive conspiracies. Avoidance rules do not criminalize transfers of property, nor do they impose liability automatically for any such transfer. Instead, such rules, in adjusting the allocation of assets once held by the debtor, require courts to scrutinize a debtor's actions prior to its bankruptcy filing and, under certain circumstances, to nullify those actions. Liability for a transfer is contingent on the subsequent commencement of insolvency proceedings. Thus, it may be seen that although avoidance rules unquestionably aim to influence pre-petition conduct, *see, e.g., Union Bank v. Wolas*, 502 U.S. 151, 161, 112 S.Ct. 527, 533, 116 L.Ed.2d 514 (1991), a conflict between two avoidance rules exists if it is impossible to distribute the debtor's assets in a manner consistent with both rules. Second, although our allusions to English law should not be understood as an attempt to prejudice the outcome of any future litigation on that subject in British courts, the parties in the present actions have assumed that the "intent" requirement in the English law would dictate a different distributional outcome than would United States law. Consequently, it is not possible to comply with the rules of both forums and the threshold requirement of a true conflict exists for purposes of comity analysis.

Nor is it relevant in this regard that Justice Hoffman—in a decision affirmed on appeal—refused to issue an anti-suit injunction prohibiting the administrators from instituting the present action against Barclays. Plaintiffs seize on his finding that there is nothing "oppressive" about the difference between the American and English avoidance laws. Contrary to plaintiffs' assertion, this finding did not imply that there is no conflict between the two laws—it meant simply that the conflict was not so severe as to warrant the extraordinary remedy of an anti-suit injunction. Moreover, the High Court proceeded on the assumption that the American court would evaluate the strength of the American connection to the alleged transfers. *Homan*, [1992] BCC at 767. Such an approach is in substance the same as the "international comity" doctrine described in this opinion.

### III  Propriety of Dismissal by the Bankruptcy Court

#### A.  *Standard of Review*

Having established that the doctrine of comity applies, we now explain why we think dismissal was warranted, that is to say, why the statute was properly construed not to reach the pre-petition fund transfers to the defendant banks. The district court reviewed the bankruptcy court's ruling on the comity issue for abuse of discretion. *See Maxwell II*, 186 B.R. at 822. Because the doctrine in theory is relevant to construing a statute's reach, one might expect that *de novo* review of the bankruptcy court's decision would have been in order. *See, e.g., Koreag*, 961 F.2d at 347–48 (review of statutory interpretation is a matter of law). The banks declare, however, that under *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993), the bankruptcy court's application of the comity doctrine is reviewed for an abuse of discretion. Although plaintiffs do not dispute this, the examiner contends that we must decide anew whether the bankruptcy court applied the correct legal standard, that is, whether the comity doctrine applied in the first place.

■ Ascertaining the relevant standard need not detain us overly long. It was appropriate as a matter of law to analyze the Bankruptcy Code in light of international comity. Moreover, even though plaintiffs apparently concede that an abuse-of-discretion standard applies once the doctrine's threshold requirements have been satisfied, we nonetheless would hold that dismissal on comity grounds was appropriate even were our review of this case *de novo*. We need not on this appeal decide therefore which standard applies. Regardless of the applicable standard, we agree with the lower courts that English law governs resolution of this litigation.

#### B.  *Primacy of English Law*

England has a much closer connection to these disputes than does the United States. The debtor and most of its creditors—not only the beneficiaries of the pre-petition transfers—are British. Maxwell was incorporated under the laws of England, largely controlled by British nationals, governed by a British board of directors, and managed in London by British executives. These connecting factors indicated what the bankruptcy judge called the "Englishness" of the debtor, which was one reason for recognizing the administrators—who are officers of the High Court—as Maxwell's corporate governance. *Maxwell I*, 170 B.R. at 817 n. 23. These same factors, particularly the fact that most of Maxwell's debt was incurred in England, show that England has the strongest connection to the present litigation.

Although an avoidance action concededly affects creditors other than the transferee, because scrutiny of the transfer is at the heart of such a suit it is assuredly most relevant that the transfers in this case related primarily to England. The $30 million received by Barclays came from an account at National Westminster in London and, while it was routed through Barclays' New York branch like all payments received in U.S. dollars, it was immediately credited to an overdraft account maintained in England. Plaintiffs claim no particular United States connection to the other alleged transfers to Barclays, all of which were denominated in the amended complaint in pounds sterling. Similarly, the transfers to National Westminster and Société Générale were made to and from accounts maintained in Great Britain.

Further, the overdraft facilities and other credit transactions between the transferee banks and the debtor resulted from negotiations that took place in England and were administered primarily there. English law applied to the resolution of disputes arising under such agreements. We recognize that some of the money transferred to the banks came from the proceeds of the sale of Maxwell subsidiaries in the United States, which is a subject we discuss in a moment. In almost all other respects, however, the credit transactions were centered in London and the fund transfers occurred there.

#### C.  *Relative Interests of Forum and Foreign States*

Given the considerably lesser American connection to the dispute, the bankruptcy

court believed its forum's interests were "not very compelling." *Maxwell I,* 170 B.R. at 818. Virtually the only factor linking the transfers to the United States—that the sale of certain Maxwell subsidiaries in the United States provided the source of some of the funds—is not particularly weighty because those companies were sold as going concerns. Hence, the potential effect that such sales might have had on local economies is not here implicated.

The examiner warns that dire consequences would result from a failure to enforce the Code's avoidance provision. The first one he mentions is that such a course ignores § 103(a) of the Code. This contention is one we have already addressed and rejected. The examiner next urges that the purposes underlying § 547 and § 502(d) would be thwarted unless both of these provisions were applied in all Chapter 11 proceedings. Although the non-application of these or other Bankruptcy Code provisions certainly might detract from the Code's policies in other cases, here the negative effects are insubstantial. The principal policies underlying the Code's avoidance provisions are equal distribution to creditors and preserving the value of the estate through the discouragement of aggressive pre-petition tactics causing dismemberment of the debtor. *Wolas,* 502 U.S. at 161, 112 S.Ct. at 533. These policies are effectuated, although in a somewhat different way, by the provisions' British counterpart. *See Maxwell I,* 170 B.R. at 818.

In the present case, in which there is a parallel insolvency proceeding taking place in another country, failure to apply § 547 and § 502(d) does not free creditors from the constraints of avoidance law, nor does it severely undercut the policy of equal distribution. All avoidance laws are necessarily limited in scope because time limits and other conditions are imposed on the voidability of transactions. Although a different result might be warranted were there no parallel proceeding in England—and, hence, no alternative mechanism for voiding preferences— we cannot say the United States has a significant interest in applying its avoidance law. Moreover, as noted, international comity is a policy that Congress expressly made part of the Bankruptcy Code, and a decision consistent with comity therefore furthers the Code's policy.

Because of the strong British connection to the present dispute, it follows that England has a stronger interest than the United States in applying its own avoidance law to these actions. Its law implicates that country's interest in promoting what Parliament apparently viewed as the appropriate compromise between equality of distribution and other important commercial interests, for instance, ensuring potentially insolvent debtors' ability to secure essential ongoing financing. In addition, although complexity in the conduct of transnational insolvencies makes choice-of-law prognostication imprecise, we agree with the lower courts that English law could have been expected to apply. *See Maxwell II,* 186 B.R. at 823; *Maxwell I,* 170 B.R. at 818; *see also Canada S. Ry. v. Gebhard,* 109 U.S. 527, 537–38, 3 S.Ct. 363, 370, 27 L.Ed. 1020 (1883) (domestic creditors of foreign bankrupts "presumed to have contracted with a view to ... laws of th[e] [foreign] government").

The administrators further declare that the English court's decision vacating the *ex parte* anti-avoidance suit order established that the application of our preference law by the Southern District courts would not violate the law of nations, and that American courts should not use comity as a reason to decline to assert jurisdiction under section § 547. The decision in the English court implied nothing of the kind. Instead, that court ruled that Barclays could not obtain an injunction because an expression of the principle of comity that relied on the good sense of the bankruptcy court outweighed the risk that it would assume jurisdiction in violation of international law. *Homan,* [1992] BCC at 762.

Rather than take a confrontational posture by enjoining this litigation and prejudice the cooperation which has thus far prevailed between the Chapter 11 and the English administration, *id.* at 767, the High Court left the merits of the question for the American courts to decide. Thus, the English court's decision affords no basis for concluding that England's interests are insubstantial.

## D. Cooperation and Harmonization: Systemic Interest

In addition to the relative strength of the respective jurisdictional interests of England and the United States, there is a compelling systemic interest pointing in this instance against the application of the Bankruptcy Code. These parallel proceedings in the English and American courts have resulted in a high level of international cooperation and a significant degree of harmonization of the laws of the two countries. The affected parties agreed to the plan and scheme despite differences in the two nations' bankruptcy laws. The distribution mechanism established by them—beyond addressing some of the most obvious substantive and procedural incongruities—allowed Maxwell's assets to be pooled together and sold as going concerns, maximizing the return to creditors. And, by not requiring a creditor to file its claim in both forums, the arrangement eliminated many of the inefficiencies usually attendant in multi-jurisdiction proceedings.

Taken together, these accomplishments—which, we think, are attributable in large measure to the cooperation between the two courts overseeing the dual proceedings—are well worth preserving and advancing. This collaborative effort exemplifies the "spirit of cooperation" with which tribunals, guided by comity, should approach cases touching the laws and interests of more than one country. See Société Nationale, 482 U.S. at 543 n. 27, 107 S.Ct. at 2555 n. 27 (1987). Where a dispute involving conflicting avoidance laws arises in the context of parallel bankruptcy proceedings that have already achieved substantial reconciliation between the two sets of laws, comity argues decidedly against the risk of derailing that cooperation by the selfish application of our law to circumstances touching more directly upon the interests of another forum.

It should be remembered that the interest of the system as a whole—that of promoting "a friendly intercourse between the sovereignties," Hilton, 159 U.S. at 165, 16 S.Ct. at 144—also furthers American self-interest, especially where the workings of international trade and commerce are concerned. See, e.g., Mitsubishi Motors Corp. v. Soler Chrys-ler–Plymouth, Inc., 473 U.S. 614, 629, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985) (international policy favors deferral to transnational tribunals); Wildenhus's Case, 120 U.S. 1, 12, 7 S.Ct. 385, 387, 30 L.Ed. 565 (1887) (interest in promoting commerce produced rule that law of nation to which vessel belonged generally governed conduct aboard ships).

We recognize that forbearance and goodwill in the conduct of international bankruptcies is an ideal not easily achieved in the near-term. Many commentators advocate centralized administration of each insolvency under one country's laws, which could require a multi-lateral treaty or, even, a greater degree of harmonization of the commercial laws throughout the world. See, e.g., Douglass G. Boshkoff, Some Gloomy Thoughts Concerning Cross–Border Insolvencies, 72 Wash.U.L.Q. 931, 931–36 (1994). In the meanwhile, bankruptcy courts may best be able to effectuate the purposes of the bankruptcy law by cooperating with foreign courts on a case-by-case basis. Congress contemplated this approach when it provided for "ancillary" proceedings under 11 U.S.C. § 304. Although comity analysis admittedly does not yield the commercial predictability that might eventually be achieved through uniform rules, it permits the courts to reach workable solutions and to overcome some of the problems of a disordered international system. Given that the scheme and plan in this case did not clearly address the choice-of-law and choice-of-forum questions that have generated this litigation, resort to comity and choice-of-law principles should naturally have been foreseen. Consequently, the interests of the affected forums and the mutual interest of all nations in smoothly functioning international law counsel against the application of United States law in the present case.

## IV Denial of Distributions Under 11 U.S.C. § 502

The final issue to be resolved is the plaintiffs' contention that even if the pre-petition transfers to the banks may not be recovered under § 547 for comity reasons or otherwise, the administrators are nevertheless entitled

under § 502(d) to deny distributions to the banks as unsecured creditors. Section 502(d) provides in relevant part that "the court shall disallow any claim of any entity ... that is a transferee of a transfer avoidable under section ... 547 of this title."

■ The district court turned this challenge aside on two separate grounds. It held that § 502 is inapplicable because § 547 does not govern the avoidance action by the administrators and the transfers are therefore not "avoidable" under § 547. *Maxwell II*, 186 B.R. at 824. Further, it stated that the banks have not filed "claims" under § 502(d) because they have never submitted themselves to the bankruptcy court's jurisdiction. Defendants declare that this argument was waived because it was not submitted to the bankruptcy court. We nonetheless exercise our appellate discretion to entertain the issue because it is one of law, it was clearly presented in the adversary complaints, it was argued before and decided by the district court, and the transcript of hearing on the Rule 12(b)(6) motions indicates the bankruptcy court was quite aware of the relevant statute.

■ We hold that § 502(d) does not apply, but for reasons slightly different than those expressed by the district court. The plaintiffs strongly urge that the district court conflated § 547 and § 502(d) by reading the words "transfer avoidable" in the latter to mean any transfer that actually could be recovered by the estate under the former. They rely on cases holding that disallowance is required under § 502(d) even where a transfer may not affirmatively be recovered because the limitations period for such recovery has expired. *See, e.g., United States Lines, Inc. v. United States (In re McLean Indus.),* 184 B.R. 10, 16 (Bankr.S.D.N.Y. 1995), *aff'd,* 196 B.R. 670 (S.D.N.Y.1996).

The rule that § 502(d) disallowance is not precluded by the expiration of the limitations period governing recovery under § 547, however sound it may be, does not control in this case. Where a transfer could be avoided under § 547 but for the running of the statute of limitations, disallowance may be warranted because the substantive provisions of § 547, as opposed to the time-limit set forth

in § 546(a), still apply to the transfer at issue. *See McLean,* 184 B.R. at 15 (§ 502(d) refers to § 547, not § 546). But in the present case, the doctrine of comity leads to the conclusion that § 547 does not apply to the pre-petition transfers at all. Consequently, the transfers cannot in any way be included among the "transfers avoidable" listed in § 502(d). In addition, because § 502(d) and § 547 apply to the same types of transfers and serve similar purposes, the former is inapplicable to the present case for the reasons discussed in Part III of this opinion.

■ With respect to the district court's alternative ground for denying relief under § 502(d), we must agree with the administrators that the banks' decision to lodge notices of claim in England, rather than filing proofs of claim with the bankruptcy court, cannot be construed to mean that they have not submitted "claims" for purposes of the Bankruptcy Code. To be eligible for distributions under the plan, the banks had to submit "claims," which must be "allowed." *See* 11 U.S.C. § 726(a).

As observed in our discussion of *res judicata,* Part I *supra,* by requiring the administrators to pass along to the bankruptcy court notices of claim filed in England, the plan and scheme comply with the Code's requirement that a proof of claim be filed with the bankruptcy court. Such claims are "allowed" under the Code, *see* § 502(a), if they are accepted without objection by the administrators or liability is established by adjudication in the appropriate court, which may be the bankruptcy court or the English court depending upon the circumstances. We are therefore unable to agree with the district court's conclusion that § 502(d) is inapplicable because the banks have not submitted "claims."

## CONCLUSION

In sum, we hold that the binding effect of the confirmation order does not preclude the banks from challenging the applicability of the Bankruptcy Code's avoidance rules to these actions brought by the administrators. Further, in this unique case involving cooperative parallel bankruptcy proceedings seek-

ing to harmonize two nations' insolvency laws for the common benefit of creditors, the doctrine of international comity precludes application of the American avoidance law to transfers in which England's interest has primacy. We decline to decide whether, setting aside considerations of comity, the "presumption against extraterritoriality" would compel a conclusion that the Bankruptcy Code does not reach the pre-petition transfers at issue. Thus, we express no view regarding the banks' contention that the Bankruptcy Code *never* applies to non-domestic conduct or conditions. Finally, we reject plaintiffs' argument that the defendant banks' claims against the estate must be disallowed under § 502(d) notwithstanding the non-applicability of § 547.

Accordingly, for the reasons stated, the order appealed from is affirmed.